

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00077-CV

_____

IN THE MATTER OF A.M., A JUVENILE

On Appeal from the 323rd District Court
Tarrant County, Texas
Trial Court No. 323-107645-18

Before Sudderth, C.J.; Birdwell and Womack, JJ.
Memorandum Opinion by Justice Womack

# MEMORANDUM OPINION

## I. INTRODUCTION

A jury adjudicated A.M. delinquent after finding that she had engaged in delinquent conduct by committing the offense of murder when she stabbed and caused the death of N.L.[1] The jury found that A.M. was in need of rehabilitation or that the protection of the public or A.M. required a disposition and did not find that A.M. had caused the death of N.L. under the immediate influence of sudden passion arising from an adequate cause. The jury sentenced A.M. to commitment for twenty-five years. The juvenile court adjudicated A.M. delinquent and sentenced her to commitment in accordance with the jury's disposition. The juvenile court also made an affirmative finding that A.M. had used or exhibited a deadly weapon, a knife, during the commission of the offense or during the immediate flight therefrom.

In a single issue, A.M. appeals the juvenile court's denial of her request that the jury be charged on the lesser-included offense of manslaughter. We will affirm the juvenile court's judgment and commitment.

---

[1]The petitioner ("the State") waived prosecution under paragraph one of the petition, which alleged that A.M. intentionally and knowingly caused the death of N.L. and proceeded to seek adjudication under paragraph two, which alleged that A.M. "did intentionally, with the intent to cause serious bodily injury to [N.L.], commit an act clearly dangerous to human life, namely, stabbing [N.L.] with a knife, and thereby caused the death of [N.L.]." The jury did not find that A.M. committed the offense of aggravated assault against a different complainant, J.D., as alleged in paragraph three of the petition.

## II. BACKGROUND

### A. Witness Testimony

These events involve four girls. At the time of trial, S.B and J.D. were fourteen years old. On May 28, 2018, S.B., J.D., and A.M. went to N.L.'s house and planned to spend the night with her. A.M., N.L., and J.D. lived near each other, and it was a one- to two-minute walk between A.M.'s and N.L.'s apartments.

Earlier in the day, the girls went swimming in Fort Worth and returned to N.L.'s apartment where they listened to music and danced. In the evening, A.M. and N.L. had a petty argument. J.D. went home with A.M., and later they went to a nearby store for A.M.'s mother. During that time, S.B. and N.L. continued dancing and listening to music at N.L.'s apartment. A.M. and N.L. messaged each other, and S.B. observed that N.L. appeared to be angry.

After delivering groceries to her mother, A.M. and J.D. walked back to N.L.'s house for the purpose of retrieving A.M.'s clothes. J.D. stayed outside. A.M. was angry when she left N.L.'s apartment. She slammed the door as she left and declared to J.D. that she was going to fight N.L. J.D. and A.M. walked back to A.M.'s apartment and arrived after midnight. J.D. tried to sleep, but A.M. was angry and continued using her phone to message someone. A.M. eventually told J.D. to get up and stated that N.L. was coming over. A.M. and J.D. began waiting outside A.M.'s apartment at about 2:30 a.m.

After N.L. informed S.B. that she had to exchange some clothes with A.M., they walked to A.M.'s apartment and arrived at about 3:00 a.m. A.M. walked up to N.L. S.B. was worried, and J.D. stayed on the sidewalk. According to S.B., N.L. handed A.M.'s bag of clothes to her. A.M. set the bag on the ground behind her and threw a bag of N.L.'s clothes at N.L.'s feet. S.B. observed that when N.L. attempted to pick up the bag, A.M. "ran up on her and hit [N.L.]" about her face. N.L. started to fight back. J.D. did not recall who started the fight. The two girls fought for about two minutes before S.B. and J.D. broke up the fight and pulled A.M. and N.L. off each other.

A.M. and N.L. remained angry and cussed at each other after the fight. J.D. told N.L. to go home. S.B. thought A.M. had finished fighting, but as A.M. walked back to her apartment, S.B heard A.M. say, "I'm going to kill this bitch." S.B. did not think A.M. was serious. As she and N.L. began to walk away, N.L. returned to retrieve her blanket from J.D. J.D. had stayed outside because she was worried about N.L. She returned the blanket to N.L. but then told S.B. and N.L. to run. S.B. saw A.M. running with a kitchen knife. J.D. was worried that A.M. was going to hurt N.L. J.D. struggled with A.M. for about thirty seconds and attempted to grab the knife from A.M.'s hand or make A.M. drop the knife. A.M. said, "Let go," began swinging the knife, and got away. During this time, J.D. heard N.L. say, "Let her kill me," "Let her stab me. I want to die any ways [sic]," and N.L. did not appear to be afraid. J.D., who was scared that A.M. was going to try to hurt her too, backed up and told S.B.

4

and N.L. to run. S.B. also told N.L. to run. Although N.L. ran, she tripped over the curb. S.B. saw N.L. fall and saw A.M. stab N.L. in the neck. J.D. saw A.M. walk up to N.L., heard N.L scream, "[My] neck," and then saw blood.[2] J.D. admitted that she had seen A.M. walk up to N.L. but had not seen the stabbing and explained that she had guessed that A.M. had stabbed N.L. According to S.B., when A.M. went to stab N.L., A.M. did not trip, was not playing around, joking, or trying to scare N.L. S.B. testified, "It was intentional." J.D. stated that A.M. was the only person with a knife and declared that A.M.'s act of stabbing was no accident, "[b]ecause the way she walked up on [N.L.], that's not no accident."

S.B. ran over to N.L., took her hand, and stood her up, but A.M. returned to her apartment. J.D. and some boys who were walking from the grocery store tried to help N.L., and one of the boys ran to alert police. J.D. did not know where A.M. was at the time. S.B. ran to A.M.'s house and told A.M.'s mother to get a towel because N.L. had been stabbed. A.M.'s mother came outside with a towel, placed it around N.L.'s neck, and attempted cardiopulmonary resuscitation.

S.B. and J.D. ran to N.L.'s apartment to get her older brother, K.J. S.B. observed that A.M. followed them for a while but then noticed that A.M. ran to another location. While A.M. was following them, J.D. heard A.M. tell them "not to tell nobody." J.D. did not know where A.M. went.

---

[2]J.D. testified that N.L. was standing at the time.

When S.B. and J.D. returned, emergency personnel were placing N.L. in an ambulance. S.B. later learned that N.L. had died. N.L. was fourteen years old at the time of her death.

A.M. was not present when detectives first arrived at her apartment, but her mother and stepfather were. A.M.'s stepfather eventually brought A.M. to the police station where she was interviewed. After the interview, A.M. took police to the location where she had deposited the knife. Police located the twelve-inch knife, which had a seven and one-half inch blade, with a blanket on the patio of a vacant apartment 235 feet away from the area where the incident occurred. Testing confirmed the presence of N.L.'s DNA on the knife handle and blade. Based on his training and experience, Detective Matthew Barron opined that a knife like the one that was recovered could be a deadly weapon in the manner of its use or intended use and that the knife was a deadly weapon in this case.

Deputy medical examiner Marc Krouse performed N.L.'s autopsy. N.L. had several small injuries and a couple of hidden bruises under her scalp. Krouse concluded that the downward three-and-one-half or four-inch stab wound to the neck and chest had caused N.L.'s death and that the manner of her death was homicide. The autopsy revealed that the knife had cut through N.L.'s jugular vein and had penetrated her lung. Krouse opined that a stab wound to the neck like the one N.L. suffered was clearly dangerous to human life and that the injury to N.L.'s jugular vein was not survivable.

6

**B.    Respondent's Testimony**

A.M. testified at trial and admitted that she had returned to her apartment after fighting N.L., had retrieved a knife, and had run back outside.  A.M. explained that she did this to scare N.L. and claimed, "My intent was to never harm her."  According to A.M., N.L. turned around; said, "You real bold"; and then walked up to A.M. and said, "Stick me, stick me.  I ain't scared to die.  I want to die any ways."  A.M. claimed that she told N.L. to go home, and N.L. approached and swung at her.  A.M. said she "reacted" by stabbing N.L.  A.M. testified, "I made the most horrible mistake of my life and I wish I was thinking at the time but emotions were so high and we both [had] not fully calmed down yet."  After A.M. withdrew the knife, she tried to stop N.L., who was panicking, from running.  N.L. collapsed.

A.M. claimed that she went into her house and came back with towels to put on N.L.'s neck but did not tell her mother about the stabbing because she was only thinking of helping N.L.  A.M. also claimed that after her mother ran outside to help N.L., she instructed A.M. to run.  A.M. ran back to the apartment, grabbed N.L.'s blanket, wrapped the knife in it, and ran to another area of the apartment complex.  A.M. placed the knife and the blanket "over [a] balcony."  At about 4 a.m., A.M.'s mother informed her by message that N.L. was dead.  Eventually, A.M. provided her location to her father, and he transported her to the police station.

A.M. admitted that she was not truthful when she first spoke with the detectives and had falsely told them that N.L. had a knife too.  A.M. testified that she

had harmed N.L. "unintentionally" and had walked outside with the knife with the intention of scaring N.L. so that she would run home. A.M. and N.L.'s phones were examined, and the messages on them indicated that they had intended to fight each other. However, in one of her messages, A.M. wrote to N.L., "[B]itch I'll kill you on my . . . life." A.M. testified that she "didn't mean" what she had written. In her response, N.L. had written, "OMG is this a threat, am I supposed [to] be scared?"

A.M. agreed that she could have stayed inside after the fight or could have dropped the knife when J.D. grabbed her wrist but declared that she had never stated after the fight that she was "going to kill this bitch." The following colloquy then occurred:

> [The State]: I mean, you were already super mad when you came outside that night, right?
>
> [A.M.]: Yes.
>
> [The State]: You were already super mad when you pulled away from [J.D.] even though she was asking you not to do it?
>
> [A.M.]: Yes.
>
> [The State]: And then [N.L.] is not running away, she's not showing fear of you, she's being defiant to you, right?
>
> [A.M.]: Yes.
>
> [The State]: So if that's the situation, if you're just trying to scare her, why would you stab her in the neck of all places?
>
> [A.M.]: She ran up on me.

[The State]:  Okay.  My question is though why would you stab her in the neck of all places on her body?

[A.M.]:  I mean, I don't know.  She ran up on me.  She swung at me.

[The State]:  Did you not think there was a danger to stabbing her in any way?

[A.M.]:  No --

[The State]:  Is there ever a good stab, I guess, I should ask you?

[A.M.]:  No.

[The State]:  Okay.  So when you -- do you think it's going to be more than just scaring somebody to plunge a knife into the inside of their body?

[A.M.]:  Yeah[,] but I thought she would at least run or go home.

[The State]:  Well, but she wasn't and that made you mad, didn't it?

[A.M.]:  No.

[The State]:  Mad enough to do something that you could never imagine doing?

[A.M.]:  It was unintentionally.

[The State]:  Well, did you trip?

[A.M.]:  No.

[The State]:  Did you fall into her with that knife?

[A.M.]:  No.

[The State]:  Now, you did intentionally stab . . . her with it, right?

[A.M.]:  No.

9

[The State]:  I guess my question is you weren't just trying to wave the knife in front of her, right, you were actually trying to hit her with it?

[A.M.]:  It was just a reaction.

[The State]:  But if it was just a reaction, why did you run?

[A.M.]:  What you mean?

[The State]:  Why did you run away and not talk to the police officers there?

[A.M.]:  I was scared.

[The State]:  Okay.  Why did you go hide the knife if it was just a reaction?

[A.M.]:  I mean, where the knife was, that's where I was.

[The State]:  You knew you had done something wrong; is that -- is that fair to say or do you disagree with me on that?

[A.M.]:  Yeah.

[The State]:  You did something that was illegal.  Did you understand that when you did it?

[A.M.]:  Yes.

[The State]:  You knew the cops were going to be coming, didn't you?

[A.M.]:  Yes.

A.M. claimed that she did not recall wiping the knife with the blanket.  Barron was recalled during the State's rebuttal and testified that A.M.'s "I will kill you" message had been found on N.L.'s phone but had been deleted from the messages on

10

A.M.'s phone. He also testified that during her police interview, A.M. had described wiping the blood off of the knife with a blanket.

## III. DISCUSSION

### A. Requested Instruction on Manslaughter

The second paragraph of the petition alleged that A.M. had engaged in delinquent conduct on or about May 29, 2018, in Tarrant County when she intentionally, with the intent to cause serious bodily injury to N.L., committed an act clearly dangerous to human life, namely, stabbing N.L. with a knife, and thereby caused N.L.'s death, thus violating Penal Code Section 19.02. Tex. Penal Code Ann. § 19.02(b)(2) (Murder) (establishing that a person commits the offense of murder if she intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual).

A person commits manslaughter if he recklessly causes the death of an individual. *Id.* § 19.04(a) (Manslaughter). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." *Id.* § 6.03(c). The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint. *Id.*

11

During the charge conference, A.M. requested that the juvenile court's charge instruct the jury on manslaughter. *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992) (explaining that regardless of the strength or weakness of the evidence, if any evidence raises the issue that the defendant was guilty only of the lesser offense, a charge on the lesser offense must be given). The juvenile court recalled that no evidence was presented establishing that A.M. "was aware of the risk and consciously disregarded the risk" as would satisfy the reckless element of manslaughter and denied the requested manslaughter instruction. In her sole issue, A.M. contends that the juvenile court harmfully erred when it denied her requested instruction on manslaughter. We disagree.

**B.     Standard of Review**

Juvenile delinquency proceedings are "quasi-criminal" in nature. *In re L.D.C.*, 400 S.W.3d 572, 574 (Tex. 2013). Except as otherwise provided by the juvenile justice code, juvenile proceedings are governed by the rules of evidence applicable to criminal cases and by articles 33.03 and 37.07 and Chapter 38 of the Code of Criminal Procedure. *See* Tex. Fam. Code Ann. § 51.17(c). Standards of review applicable to criminal cases also may apply to a juvenile adjudication. *In re A.J.G.*, 131 S.W.3d 687, 691 (Tex. App.—Corpus Christi–Edinburg 2004, pet. denied). Article 36.14 requires that the trial court charge the jury on the "law applicable to the case." Tex. Code Crim. Proc. Ann. art. 36.14; *In re J.R.C.S.*, 393 S.W.3d 903, 913 (Tex. App.—El Paso 2012, no pet.).

12

In determining whether a defendant was entitled to have an instruction on a lesser offense included in the trial court's charge to the jury, we employ the two-step *Aguilar/Rousseau* test. *See* Tex. Code Crim. Proc. Ann. arts. 37.08 (Conviction of lesser included offense), 37.09 (Lesser included offense); *Ritcherson v. State*, 568 S.W.3d 667, 670–71 (Tex. Crim. App. 2018) (citing *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993)); *see Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012). First, we compare the statutory elements of the alleged lesser offense and the statutory elements and any descriptive averments in the indictment. *Ritcherson*, 568 S.W.3d at 670–71; *Cavazos*, 382 S.W.3d at 382 (explaining that the first step of the test is a question of law that may be performed pre-trial or on appeal). Second, there must be evidence from which a rational jury could find the defendant guilty of only the lesser offense. *Ritcherson*, 568 S.W.3d at 671. This evidentiary requirement is met if there is (1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense. *Id.* (citing *Saunders v. State*, 840 S.W.2d 390, 391–92 (Tex. Crim. App. 1992)). The evidence raising the lesser offense must be affirmatively in the record. *Ritcherson*, 568 S.W.3d at 671. In other words, a defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be "directly germane to the lesser-included offense[.]" *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). In

13

performing this analysis, we consider not just the evidence presented by the defendant, but all the evidence admitted at trial, and if there is more than a scintilla of evidence raising the lesser offense and negating or rebutting an element of the greater offense, the defendant is entitled to a lesser-offense instruction. *Ritcherson*, 568 S.W.3d at 671 (citing *Roy v. State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017)). The evidence need not be controverted or even credible. *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994).

## C.     Analysis

The court of criminal appeals has concluded that manslaughter is a lesser-included offense of murder. *See Cavazos*, 382 S.W.3d at 384. We therefore proceed to the second step of the test and determine whether the requested instruction on manslaughter was warranted based on the evidence. *Ritcherson*, 568 S.W.3d at 671.

### 1.     A.M.'s contentions

Relying on evidence of the knife length and the deputy medical examiner's testimony that a sharp object that penetrates the skin without striking bone "tends to go right through everything else," along with the inferences that may be drawn from that evidence, A.M. asserts that her acts and conduct provide more than a scintilla of evidence to show that her actions were reckless rather than intentional. A.M. also asserts that her testimony that she "reacted" in response to N.L.'s approaching and swinging at her allowed the jury to infer that A.M. was aware of the risk the knife posed and disregarded the risk by defending herself while holding the knife. A.M.

14

asserts that this evidence also shows that she acted recklessly rather than intentionally. According to A.M., this inference is further supported by her testimony that she "unintentionally" stabbed N.L. and did not intend to harm N.L. She asserts that the evidence negates and refutes the "intentional" culpable mental state required for the offense of murder and that if believed, this evidence permitted the jury to determine that she engaged in delinquent conduct only by committing manslaughter. A.M. argues that this inference is further buttressed by additional inferences that the jury may have drawn from the evidence of the knife length and soft tissue injuries and establishes that she did not intend to cause N.L. serious bodily injury "because [if she had so intended,] the knife would have continued to penetrate further into N.L.'s chest cavity." She concludes that the manslaughter instruction should have been given because the evidence negates or refutes an intent to cause serious bodily injury and supports a finding that she was aware of the risk of N.L.'s death but consciously disregarded the risk by attempting to defend herself with a knife.

## 2.     The evidence does not warrant a manslaughter instruction

In determining whether evidence exists to support a charge on recklessness, we cannot pluck from the record and examine in a vacuum the defendant's statement that she did not intend to kill. *See Martinez v. State*, 16 S.W.3d 845, 847 (Tex. App.—Houston [1st Dist.] 2000, pet ref'd). Having reviewed all of the evidence, including all of A.M.'s testimony, we conclude that the juvenile court did not err when it denied A.M.'s requested manslaughter instruction because there is no affirmative evidence

15

from which a rational juror could infer that A.M. was aware of but consciously disregarded a substantial and unjustifiable risk that death would occur as a result of A.M.'s conduct. *See* Tex. Penal Code Ann. §§ 6.03(c), 19.04(a); *Ritcherson*, 568 S.W.3d at 671. We also disagree with A.M.'s assertion that because N.L. did not suffer other injuries beyond the injuries to her jugular vein and lung, a rational juror could infer that she did not intend to cause N.L. serious bodily injury. Although there is some evidence that A.M. did not intend to kill N.L., there must also be some affirmative evidence in the record that would permit a rational juror to infer that A.M. was aware of but consciously disregarded a substantial and unjustifiable risk that death would occur as a result of her conduct and that evidence must be sufficient to establish manslaughter as a valid, rational alternative to murder. *See Ritcherson*, 568 S.W.3d at 671; *Cavazos*, 382 S.W.3d at 385.

In this case, there is no evidence that A.M. was aware of a substantial and unjustifiable risk that N.L.'s death would occur as a result of her conduct and that she had consciously disregarded that risk. At trial, the State's prosecutor explicitly asked A.M. whether she thought there was a danger to stabbing N.L., and she answered, "No." When A.M. was asked whether she had thought "[it was] going to be more than just scaring somebody to plunge a knife" into that person's body, A.M. answered, "Yeah," but she explained that she had thought N.L. would run or go home. This is not evidence that A.M. was aware of a substantial and unjustifiable risk that N.L. would die as a result of her conduct—A.M. specifically stated that she

16

thought her conduct would result in N.L. running or going home. *See Nevarez v. State*, 270 S.W.3d 691, 694 (Tex. App.—Amarillo 2008, no pet.) (holding that trial court did not err in refusing to instruct jury on lesser offense of manslaughter; defendant's testimony that he panicked, was scared, swung a knife while trying to protect himself, and accidentally stabbed the victim in the neck was not evidence that the defendant had been reckless). The evidence in this case shows that A.M. did not act recklessly.

Moreover, to be entitled to the manslaughter instruction, the evidence must be "directly germane" to the offense of manslaughter and must rise to a level to permit a jury to find that if A.M. is guilty, she is guilty only of manslaughter. *Id.* at 693. Evidence that A.M. first physically fought with N.L., left to obtain a knife, returned to scare N.L., and then stabbed N.L., and A.M.'s later declaration that she did not intend to harm N.L. but intended only to scare N.L. and thought N.L. would run or go home, is not evidence directly germane to recklessness, and in the absence of additional evidence, the evidence in this case does not rise to a level that would permit a juror to find that, if guilty, A.M. is guilty only of the lesser offense of manslaughter.

The State relies on *Ritcherson* for the proposition that we should reject A.M.'s "reaction" testimony because it fails to satisfy the second prong of our analysis. *See* 568 S.W.3d at 677. In *Ritcherson*, the court of criminal appeals considered testimony that the defendant had stabbed the victim "as a reflexive reaction to being struck on the head by a shoe." *Id.* at 677. The court concluded that even if the "reflexive" testimony meant that the defendant had been unable to physically control her act of

17

stabbing the victim in response to being attacked, the jury could not have reasonably inferred that the defendant had stabbed the victim "only recklessly" because a jury cannot infer intent from a reflexive action—a person can only commit a criminal offense if she voluntarily engages in the conduct, and a reflexive reaction does not constitute a voluntary act. *See* Tex. Penal Code Ann. § 6.01(a); *Ritcherson*, 568 S.W.3d at 677. In this case, there is no evidence that A.M.'s "reaction" was "reflexive" such that she was unable to physically control her stabbing action in response to an attack. We have determined that the evidence, including evidence that A.M. "reacted," does not permit a rational juror to find that if A.M. is guilty, she is guilty only of manslaughter. Thus, the juvenile court did not err by denying the requested instruction on the lesser offense of manslaughter, and we overrule A.M.'s sole issue.

## IV. CONCLUSION

Having overruled A.M.'s sole issue on appeal, we affirm the juvenile court's adjudication and disposition orders.

/s/ Dana Womack

Dana Womack
Justice

Delivered: August 29, 2019

18