**Opinion filed April 8, 2021**



## In The

# Eleventh Court of Appeals

_____

## Nos. 11-19-00126-CR & 11-19-00127-CR

_____

### DAVID YBARRA JR., Appellant

### V.

### THE STATE OF TEXAS, Appellee

**On Appeal from the 50th District Court**
**Baylor County, Texas**
**Trial Court Cause Nos. 5693 & 5694**

### O P I N I O N

Appellant, David Ybarra Jr., was indicted in Cottle County in separate cause numbers for the aggravated kidnapping and murder of Cruz Garibaldi Jr. *See* TEX. PENAL CODE ANN. §§ 20.04(a)(3)–(4), (b), 19.02(b)(2) (West 2019). Each offense was enhanced by allegations of prior felony convictions for delivery of a controlled substance and conspiracy to harbor and transport unlawful aliens. Appellant filed a

motion to change venue in each cause and alleged that there existed so great a prejudice against him that he could not obtain a fair and impartial trial in Cottle County, namely because "[the] incident[s] [had] been widely publicized in [Cottle] County." *See* TEX. CODE CRIM. PROC. ANN. art. 31.03(a)(1) (West 2006). The State did not contest Appellant's change of venue requests. As such, for the convenience of the parties and in the interest of justice, the trial court granted the motions and changed the venue of each cause to Baylor County.[1] *Id.* art. 31.03(b).

The charged offenses were later consolidated for trial, and a Baylor County jury convicted Appellant of both offenses. Appellant thereafter pleaded "not true" to the enhancement allegations. The same jury found the enhancement allegations to be "true" and, for each conviction, assessed Appellant's punishment at eighty-five years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice and a $10,000 fine. The trial court sentenced Appellant accordingly and ordered the sentences to run concurrently.

In cases in which a change of venue has been ordered, and upon the completion of the defendant's trial, Article 31.08 of the Texas Code of Criminal Procedure grants discretion to the trial court to return the cause to the original county in which the indictment was filed. *See* CRIM. PROC. art. 31.08, § 1(a). Here, the trial court did not return these causes to Cottle County. Accordingly, these appeals were filed with this court. *See* GOV'T § 22.201(*l*).[2]

Appellant raises three issues on appeal. He contends that (1) the trial court erred when it refused to instruct the jury on the lesser included offense of unlawful

---

[1]The 50th Judicial District is composed of Baylor, Cottle, King, and Knox counties. *See* TEX. GOV'T CODE ANN. § 24.152 (West Supp. 2020).

[2]An appeal from Cottle County would be filed in the Seventh Court of Appeals. *See* GOV'T § 22.201(h).

restraint, (2) the trial court erred when it refused to instruct the jury on the lesser included offense of assault, and (3) the trial court's refusal to instruct the jury on these lesser included offenses was harmful and violated his rights to due process and to a fair trial. We affirm.

## I. *Factual Background*

Prior to Garibaldi's kidnapping and murder, Appellant and Garibaldi were involved in a conflict concerning a debt Garibaldi allegedly owed to Appellant. During a previous confrontation concerning the debt, they allegedly exchanged heated words at a local convenience store, and Appellant slapped Garibaldi. On February 26, 2018, three months after the incident at the convenience store, Garibaldi went to Appellant's home to again confront him about the debt. Appellant was not home, but his thirteen-year-old son, J.Y., answered the door and spoke with Garibaldi. J.Y. testified that Garibaldi appeared intoxicated. After a brief discussion, Garibaldi slapped J.Y. and then left. J.Y. thereafter called Appellant and informed him of what had occurred.

Later that evening, Garibaldi visited a friend, Joe Angel Macias, and they discussed Garibaldi's encounter with J.Y. During their conversation, Macias received a text message from Chris Dominguez, a relative of Appellant; the text message requested that Macias bring Garibaldi to Dominguez's apartment. Dominguez also stated in the text message that he would give Macias some methamphetamine if he complied with the request. Macias knew that Garibaldi used drugs, so he told Garibaldi that Dominguez had methamphetamine for them to use. Based on this assurance, Garibaldi agreed to go with Macias to Dominguez's apartment.

## A. The Attack

Macias and Garibaldi arrived at Dominguez's apartment between 8:00 p.m. and 9:00 p.m.  Dominguez and several other people, including Humberto Davila, were outside the apartment barbecuing.  Macias went inside the apartment with Dominguez, while Garibaldi remained in Macias's pickup.  Around this time, Appellant arrived in his vehicle and pulled up near Macias's pickup.  Although several witnesses—including Macias, Dominguez, Davila, and J.Y.—testified about the events that followed, their testimony conflicted on certain critical details.

### 1. Macias's Testimony

Macias testified that, while inside Dominguez's apartment, he heard a loud noise from outside that sounded like glass breaking.  After he stepped outside, Macias observed Appellant striking Garibaldi while Garibaldi was in Macias's pickup.  He then saw Dominguez strike Garibaldi in the head several times with a metal baseball bat while Appellant paced and shouted at Garibaldi.  Macias testified that, at some point during the attack, Garibaldi lost consciousness.  Appellant then pulled Garibaldi from Macias's pickup onto the ground and kicked him twice in the face.  Dominguez splashed water on Garibaldi's face while he was on the ground.  Garibaldi choked on the water but did not wake up.  Appellant then dragged Garibaldi to the rear of Macias's pickup and loaded him onto the pickup bed.  Macias testified that he believed that Appellant hit Garibaldi's head on the trailer hitch receiver twice as Appellant loaded Garibaldi onto the bed of Macias's pickup.

### 2. Dominguez's Testimony

After J.Y. informed Appellant that Garibaldi had slapped him, Appellant texted Dominguez and asked him to find Garibaldi.  Dominguez testified that he asked Macias via a text message to bring Garibaldi to Dominguez's apartment.  Dominguez also texted Appellant and advised him that Garibaldi was coming to

Dominguez's apartment. After Macias and Garibaldi arrived, Dominguez and Macias went inside the apartment. Then, Dominguez heard a loud bang outside. He went outside and saw Appellant pointing a gun into Macias's pickup at Garibaldi. Garibaldi opened the door to the pickup, and Appellant then struck him in the face with the gun at least three times. According to Dominguez, after the gun fell onto the floorboard of the pickup, Appellant struck Garibaldi two more times in the face with his fists. Dominguez then grabbed a metal bat and struck Garibaldi twice in the face with the bat. Dominguez testified that no one asked him to strike Garibaldi with the bat; he did so of his own initiative to help Appellant and to show him that he "was loyal and . . . had his back."

After Dominguez struck Garibaldi with the bat, Appellant pulled Garibaldi out of the pickup onto the ground and kicked him two more times. Macias then asked Dominguez to move Garibaldi, but Dominguez testified that he refused to touch Garibaldi. Dominguez went inside the apartment, retrieved some water, and threw it on Garibaldi's face. Garibaldi choked on the water but did not wake up. Appellant then dragged Garibaldi to the rear of Macias's pickup where, according to Dominguez, Appellant slammed Garibaldi's head into the receiver hitch three times. Although Dominguez denied helping load Garibaldi onto the bed of Macias's pickup, he testified that J.Y. assisted Appellant in doing so.

### 3. Davila's Testimony

Davila testified that Appellant struck Garibaldi in the face with a pistol five or six times. Then Dominguez struck Garibaldi on the head with the metal bat five or six times. Davila testified that either Appellant or Dominguez dragged Garibaldi out of Macias's pickup; however, both of them loaded Garibaldi onto the bed of Macias's pickup. Davila did not see anyone strike or kick Garibaldi while he was on the ground. Davila also testified that, before Macias and Garibaldi arrived,

5

Dominguez told Davila that he and Appellant were going to "beat [Garibaldi] up" because Garibaldi had slapped J.Y.

### 4. J.Y.'s Testimony

J.Y. was in Appellant's vehicle when Appellant pulled up in front of Dominguez's apartment. Appellant parked his vehicle, got out, and walked toward Macias's pickup. J.Y. testified that he heard someone say, "no guns"; he then saw Appellant drop his gun before he reached Macias's pickup. According to J.Y., Appellant struck Garibaldi in the face with his fists five to seven times. Then Dominguez hit Garibaldi in the face three times with a metal bat. J.Y. testified that, after this, Appellant pulled Garibaldi from Macias's pickup. At the time, Garibaldi was "asleep" and "snoring." Appellant then struck Garibaldi in the face with his hand once more while Garibaldi was lying on the ground. Appellant thereafter picked up Garibaldi and, with Dominguez's assistance, loaded him onto the bed of Macias's pickup.

### 5. Appellant's Testimony

Appellant denied striking Garibaldi with a pistol. Appellant stated that Garibaldi opened the door to Macias's pickup, that Dominguez took the gun from Appellant, and that Garibaldi then took a wild swing at Appellant while Garibaldi was still inside the pickup. Appellant stated that he punched Garibaldi four times in the face with his fists, knocking him out by the third punch. Appellant claimed that, after these four punches, he did not strike Garibaldi again. Nevertheless, Appellant did berate Garibaldi while he was unconscious. Then Dominguez struck Garibaldi on the head with a metal bat several times; Appellant did not direct Dominguez to do so. Appellant testified that Garibaldi fell out of Macias's pickup onto the ground after Appellant touched him to wake him up. According to Appellant, Dominguez threw water on Garibaldi, who choked but did not regain consciousness.

6

Appellant and Dominguez then picked up Garibaldi and loaded him onto the bed of Macias's pickup. Appellant denied striking Garibaldi's head on the trailer hitch receiver of Macias's pickup as they were loading him.

### 6. The Kidnapping

Macias testified that Appellant told him to drive away from the scene. Appellant sat in the front passenger seat of Macias's pickup when they left Dominguez's apartment. Although Appellant claimed that Dominguez instructed Macias to take Garibaldi away from Dominguez's apartment, Macias testified that Appellant directed him to the location where Garibaldi's body was abandoned. Appellant testified that they had planned to take Garibaldi "up the road" so Garibaldi could walk home. Nevertheless, Appellant admitted that they drove in the opposite direction from where Garibaldi's house was located. They eventually stopped on a dirt road in a secluded area, and according to Macias, Appellant thereafter dragged the unconscious Garibaldi from the bed of the pickup onto the ground. Appellant testified that, when they stopped driving, Garibaldi was conscious and exited the pickup bed on his own and without assistance. According to Appellant, Garibaldi was also conscious when they left him. However, Macias testified that he did not see any movement from Garibaldi after Appellant had "dumped him."

J.Y. remained at Dominguez's apartment while Appellant left with Macias; Garibaldi was in the bed of Macias's pickup. Later that night, J.Y. was a passenger in another vehicle with Appellant and Appellant's uncle, Daniel Ybarra, and they drove to the secluded area where Appellant had dumped Garibaldi's body. J.Y. testified that he saw Garibaldi moving slightly as they drove by him. They did not stop and left Garibaldi lying there.

Around 11:30 p.m. or 12:00 a.m. that night, Dominguez told his wife to call 9-1-1 to request assistance for Garibaldi. Chief Leroy Rodriguez of the Paducah

7

Police Department responded to the emergency dispatch and discovered Garibaldi lying near the side of a dirt road at approximately 1:30 a.m. Chief Rodriguez stated that he nearly missed Garibaldi's body while he searched for it because only Garibaldi's feet were visible from the roadside brush where he was lying. He also testified that, although he had grown up with Garibaldi, Garibaldi's face was initially unrecognizable because of the multiple facial injuries Garibaldi had sustained.

Texas Ranger Ricky Dale Brown assisted in the investigation. He took numerous photographs of both crime scenes—the secluded area where Garibaldi was discovered and the area around Dominguez's apartment—and Macias's pickup. He testified that, as he took photographs of the area where Garibaldi was found, no traffic passed by even though it was daytime.

Garibaldi was pronounced dead at approximately 6:00 p.m. on February 27, the day after he was beaten by Appellant and Dominguez. Dr. Marc Andrew Krouse, a forensic pathologist with the Tarrant Medical Examiner's District in Fort Worth, testified that all of Garibaldi's facial bones were fractured and that Garibaldi's cause of death was blunt force trauma to the head. Dr. Benedicto Baronia, a neurosurgeon at the University Medical Center in Lubbock, examined Garibaldi's CT scans and testified that Garibaldi had suffered internal hemorrhaging in his brain and that the bleeding had begun within the previous twenty-four-hour period. Both doctors testified that there is typically only a one-hour window in which to treat a patient with such injuries before the patient's condition becomes fatal. Dr. Baronia further testified that a single blow to the head with a hand or fist can cause and result in a person's death. Dr. Krouse stated that Garibaldi's fatal injuries were consistent with "all the described mechanisms of injuries . . . such as hitting with a fist, hitting with a hand -- pistol whip[ping] [Appellant] with a gun, hit[ting] [Appellant] with a

8

baseball bat, [and] kicking in the head." According to Dr. Krouse, "[t]he contribution of those four things cannot be separated."

Appellant, Dominguez, and Macias were arrested and charged for their roles and involvement in Garibaldi's beating and eventual death. For some period of time, Appellant and Macias were confined together in the Childress County Jail. During their confinement there, Appellant admitted to Macias that he struck Garibaldi in the face with a weapon at least three or four times. Another inmate at the Childress County jail, Tanner Robison, also testified that Appellant admitted to striking Garibaldi in the face with a pistol.

### 7. The Indictments and the Jury Charges

The indictment in Cause No. 5693 charged Appellant with aggravated kidnapping in the following manner:

> [Appellant] did then and there, with the intent to facilitate the commission of a felony, to-wit: aggravated assault, or to facilitate the flight after the attempt or commission of the felony, or with the intent to inflict bodily injury on Cruz Garibaldi Jr., intentionally and knowingly abduct Cruz Garibaldi Jr., hereafter styled the complainant, by restricting the movements of the complainant without his consent so as to interfere substantially with his liberty, by moving him from one place to another, with the intent to prevent his liberation, by secreting or holding him in a place where he was not likely to be found, and [Appellant] did then and there use or exhibit a deadly weapon, to-wit: a firearm or a bat, during the commission of the offense.

The indictment in Cause No. 5694 charged Appellant with murder in the following manner:

> [Appellant] did then and there, with intent to cause serious bodily injury to an individual, namely, Cruz Garibaldi Jr., hereafter styled the complainant, commit an act clearly dangerous to human life that caused the death of the complainant by striking him with a firearm, or a bat, or a hand, or a foot, or an object unknown to the grand jury.

The trial court included in the jury charge instructions on the indicted offenses of aggravated kidnapping and murder, the law of parties, and the lesser included offense of aggravated assault with a deadly weapon. At the conclusion of the guilt/innocence phase of the trial, and before the charges were read to the jury, Appellant's trial counsel requested the submission of the lesser included offenses of assault, kidnapping, and unlawful restraint. The trial court denied these requests, and the jury convicted Appellant of the aggravated kidnapping and murder of Garibaldi. This appeal followed.

## II. *Analysis*

On appeal, Appellant challenges the trial court's refusal to charge the jury as requested by Appellant. Specifically, Appellant contends that the trial court erred when it refused to instruct the jury on the lesser included offenses of unlawful restraint[3] and assault. We disagree.

Whether an instruction on a requested lesser included offense is warranted requires a two-step analysis. *Safian v. State*, 543 S.W.3d 216, 219 (Tex. Crim. App. 2018); *Rice v. State*, 333 S.W.3d 140, 144 (Tex. Crim. App. 2011) (citing *Hall v. State*, 225 S.W.3d 524, 535–36 (Tex. Crim. App. 2007)); *Mathis v. State*, 67 S.W.3d 918, 925 (Tex. Crim. App. 2002); *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993). First, we must determine, as a matter of law, whether the offense to be submitted is a lesser included offense of the charged offense. *Safian*, 543 S.W.3d at 219–20; *Rice*, 333 S.W.3d at 144. This is accomplished by comparing the statutory elements of the lesser offense and the "statutory elements and any descriptive averments in the indictment." *Ritcherson v. State*, 568 S.W.3d 667, 670–71 (Tex. Crim. App. 2018) (citing *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim.

---

[3]Appellant does not appear to appeal the trial court's refusal to instruct the jury on the lesser included offense of kidnapping. To the extent that Appellant intended to appeal this refusal, any such point of error is overruled and dismissed for inadequate briefing. *See* TEX. R. APP. P. 38.1(f), (i).

App. 2016)). As relevant here, an offense is a lesser included offense if "it is established by proof of the same or less than all the facts required to establish the commission of the offense charged." CRIM. PROC. art. 37.09(1); *Wortham v. State*, 412 S.W.3d 552, 554–55 (Tex. Crim. App. 2013). Because the first prong concerns a question of law, "[w]e do not consider the evidence that was presented at trial. Instead, we consider only the statutory elements of [the offense] as they were modified by the particular allegations of the indictment . . . . We then compare them with the elements of the [requested] lesser offense . . . ." *Wortham*, 412 S.W.3d at 555 (all but first alteration in original) (quoting *Hall*, 225 S.W.3d at 536).

Next, before an instruction on a lesser included offense is required, we must determine whether there is some evidence in the record that would permit a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense. *Safian*, 543 S.W.3d at 219; *Rice*, 333 S.W.3d at 145; *Mathis*, 67 S.W.3d at 925. This requirement is satisfied if there is "(1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense." *Ritcherson*, 568 S.W.3d at 671 (citing *Saunders v. State*, 840 S.W.2d 390, 391–92 (Tex. Crim. App. 1992)). We consider all of the evidence admitted at trial; if more than a scintilla of evidence exists in the record to raise the lesser offense and either negate or rebut an element of the greater offense, then the defendant is entitled to a lesser-included-offense jury instruction. *Id.* (citing *Roy v. State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017)); *see Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). Nevertheless, such evidence cannot be speculative; it must consist of affirmative evidence that raises both the lesser included offense and rebuts or negates an element of the greater offense. *Wortham*, 412 S.W.3d at 558. Furthermore, the

evidence must be such that it establishes the lesser included offense as a "valid rational alternative to the charged offense." *Segundo v. State*, 270 S.W.3d 79, 91 (Tex. Crim. App. 2008).

On appeal, the State concedes that the offenses of unlawful restraint[4] and assault[5] are lesser included offenses of aggravated kidnapping and murder, respectively. *See* CRIM. PROC. art. 37.09. Therefore, because the first prong of the analysis has been established, it remains only for us to determine whether there is some evidence that would permit a jury to rationally find that Appellant is guilty only of these lesser included offenses. After a thorough review of the record before us, we hold that the evidence does not rise to a level that would permit a rational jury to find that, if Appellant is guilty, he is guilty only of unlawful restraint or assault.

*A. Unlawful Restraint*

The critical element that distinguishes unlawful restraint from kidnapping or aggravated kidnapping is abduction, not restraint. *See* PENAL §§ 20.02, 20.04. A person commits aggravated kidnapping if he intentionally or knowingly abducts another person with the intent to, among other things, facilitate the commission of a felony or inflict bodily injury on the person, or he uses or exhibits a deadly weapon during the commission of the offense. *See id.* § 20.04(a)(3)–(4), (b). A person commits the offense of unlawful restraint when he intentionally or knowingly restrains another person. *Id.* § 20.02(a). The term "restrain" in this provision means "to restrict a person's movements without consent, so as to interfere substantially

---

[4]*See, e.g.*, *Schweinle v. State*, 915 S.W.2d 17, 19 (Tex. Crim. App. 1996) (holding that unlawful restraint is a lesser included offense of aggravated kidnapping).

[5]*See, e.g.*, *Hayward v. State*, 158 S.W.3d 476, 479 (Tex. Crim. App. 2005) ("It is possible, under the right set of circumstances, for the statutory elements of assault to be included within a murder because the two offenses could have the same culpable mental state and bodily injury can be a subset of serious bodily injury.").

with the person's liberty, by moving the person from one place to another or by confining the person." *Id.* § 20.01(1). "Abduct" means "to restrain a person with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not likely to be found; or (B) using or threatening to use deadly force." *Id.* § 20.01(2).

Here, Appellant contends that the jury could have found him guilty of unlawful restraint because some evidence—albeit Appellant's own testimony—tended to show that Appellant did not abduct Garibaldi but, rather, only restrained him. We disagree.

Pursuant to the trial court's charge in Cause No. 5693, the jury was authorized to convict Appellant of aggravated kidnapping if the jury found (1) that Appellant had abducted Garibaldi by either secreting him in a place where he was not likely to be found or by using or threatening to use deadly force and (2) that Appellant used or exhibited a deadly weapon during the commission of the offense. As such, there were a variety of manner and means by which the jury could have concluded that Appellant committed this offense.

All witnesses to the attack, including Appellant, testified that Appellant displayed and exhibited a firearm as he approached Garibaldi. Likewise, it is undisputed that Garibaldi lost consciousness after Appellant attacked and brutalized him. Only Appellant testified that Garibaldi regained consciousness at some point after the beating. Nevertheless, even assuming that the jury believed Appellant's version of events, the evidence is uncontroverted that Appellant displayed and exhibited a firearm during his attack on and beating of Garibaldi and that Appellant possessed and exhibited the same firearm when he and Macias transported Garibaldi away from Dominguez's apartment to the secluded, unoccupied area where Garibaldi's body was abandoned and later found.

All witnesses to the attack further testified that, after violently beating Garibaldi until he lost consciousness, Appellant—with or without assistance—moved and loaded Garibaldi onto the bed of Macias's pickup. Appellant and Macias then forcibly transported Garibaldi to a secluded and unoccupied area, discarded Garibaldi into the roadside brush adjacent to an overgrown dirt road, and abandoned him there, severely injured and without assistance. Although Appellant testified that they merely intended to move Garibaldi away from Dominguez's apartment so Garibaldi could walk home, Appellant also admitted that they drove in a direction away from Garibaldi's home after they left Dominguez's apartment. This is not evidence of restraint without abduction.

Garibaldi's body was later found in a secluded, unoccupied area. Ranger Brown testified that no traffic passed while he investigated this area and searched for Garibaldi's body. Chief Rodriguez responded to the 9-1-1 dispatch and was informed that Garibaldi's body had been left in this secluded area. Yet, he stated that he was fortunate to have located Garibaldi's body—even though he actively searched for it—because only Garibaldi's feet were visible from the outer boundaries of the roadside brush. This evidence shows that Appellant abducted and restrained Garibaldi by moving him from one place to another without his consent and by secreting him in a place where he was not likely to be found, namely the secluded, unoccupied area where Garibaldi's body was eventually located.

Furthermore, Appellant does not, and cannot, refer us to any evidence in the record that would indicate that Appellant accomplished the movement or confinement of Garibaldi with the use or threat of force other than deadly force. *See Anderson v. State*, 125 S.W.3d 729, 731, 734 (Tex. App.—Texarkana 2003, no pet.) (To be entitled to a lesser included offense instruction "there must be some evidence directly germane to an unlawful restraint offense for such an instruction to be

14

warranted."). The evidence in the record before us shows, without dispute, that Appellant—either personally or as a party—brutally attacked Garibaldi and thereafter transported him to a secluded, unoccupied area and abandoned him. Additionally, it is undisputed that, throughout the commission of this aggravated kidnapping, Appellant also used, exhibited, or possessed a deadly weapon, namely a firearm. Importantly, Appellant concedes in his brief that "[i]t is easy to see how moving Garibaldi from Dominguez's apartment to a secluded back road and dumping the body in tall weeds could facilitate the commission of aggravated assault." We agree. In this case, Appellant abducted Garibaldi with the intent to facilitate the commission of a felony, while exhibiting and displaying a deadly weapon throughout the duration of this episode. Such conduct could only constitute aggravated kidnapping, not unlawful restraint as Appellant suggests.

We have carefully reviewed the record and conclude that the evidence presented at trial does not rise to the level or provide a basis that would permit a rational jury to find that, if Appellant is guilty, he is guilty of only the lesser included offense of unlawful restraint. Furthermore, no evidence was presented to establish that the requested lesser included offense of unlawful restraint is a valid, rational alternative to the indicted offense of aggravated kidnapping to which Appellant was convicted. The second prong of the analysis cannot be satisfied. Therefore, the trial court was not required to submit, and did not err when it correctly refused to instruct the jury on, the requested lesser included offense of unlawful restraint. Accordingly, we overrule Appellant's first issue on appeal.

*B. Assault*

A person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to another. *See* PENAL § 22.01(a)(1). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *Id.*

§ 1.07(a)(8) (West Supp. 2020). A person commits the offense of murder if he intends to cause serious bodily injury to an individual and he commits an act clearly dangerous to human life that causes the death of an individual. *Id.* § 19.02(b)(2). "Serious bodily injury" is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

The indictment in Cause No. 5694 charged Appellant with the offense of murder pursuant to Section 19.02(b)(2) of the Penal Code. Therefore, to convict Appellant of this offense, the State was required to prove that (1) he intended to cause serious bodily injury, (2) he committed an act clearly dangerous to human life, and (3) his act caused the death of Garibaldi. *See id.* § 19.02(b)(2).

The testimony of multiple witnesses established the serious bodily injuries that were inflicted upon Garibaldi by Appellant. These witnesses, including Appellant, testified that Appellant struck Garibaldi in the face multiple times with his fists, feet, or a pistol. J.Y. and Appellant testified that Appellant struck Garibaldi several times in the head/face with his fists. Davila, Dominguez, and Robison testified that Appellant struck Garibaldi several times in the head/face with a pistol. Each of these witnesses, including Appellant, testified that Appellant struck Garibaldi in the face a minimum of three times and that, as a result, Garibaldi lost consciousness. In fact, Appellant even testified that, while Garibaldi was unconscious, Appellant struck him in the face again. Clearly, the extent and severity of the injuries sustained by Appellant as a result of Appellant's brutality could hardly be characterized as mere "bodily injury."

Moreover, and alternatively, the State presented evidence that Appellant also acted as a party in causing Garibaldi's serious bodily injuries. Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is

committed by his own conduct [or] by the conduct of another for which he is criminally responsible." *Id.* § 7.01(a) (West 2011). Here, the witnesses to this beating testified that, once Appellant stepped away from Garibaldi after he momentarily ceased with his barrage of punches, Dominguez then struck Garibaldi in the head several times with a metal bat. Appellant and Dominguez testified that Appellant did not ask or expect Dominguez to participate in the beating; however, after Dominguez chimed in, Appellant did not attempt to stop Dominguez's savagery. Dominguez and Appellant both testified that they had coordinated a plan to retaliate against and lure Garibaldi to Dominguez's apartment in order to ambush him because Garibaldi had slapped J.Y. earlier that day. This payback was carefully conceived. Appellant was a party to Dominguez's actions, which in concert with his own conduct resulted in and caused Garibaldi's serious bodily injuries and eventual death.

Appellant and others also testified that, after the beating, Appellant, either acting alone or with assistance, loaded Garibaldi onto the bed of Macias's pickup. Appellant and Macias then transported Garibaldi to a secluded, unoccupied area that was located in the opposite direction of Garibaldi's home, dumped his body into the brush adjacent to an isolated dirt road, and abandoned him. Furthermore, Appellant directed Macias to the secluded area where Garibaldi's body was abandoned. The State also presented medical testimony that a limited period of time existed in which to treat a person who had sustained injuries of this severity. According to Dr. Krouse and Dr. Baronia, in order to provide necessary treatment and to possibly avoid a fatal situation, only a one-hour window of opportunity existed from the time these extensive and serious injuries had been inflicted upon Garibaldi. It is undisputed that Garibaldi had been abandoned in a secluded, unoccupied area in an unconscious state for several hours before his body was located. This passage of time and

Appellant's role and direct involvement in moving and abandoning Garibaldi in the wild significantly contributed to and caused Garibaldi's eventual death. Thus, in addition to his active role in the brutal beating of Garibaldi, Appellant was clearly a party to the actions of Dominguez and Macias.

Importantly, Dr. Krouse and Dr. Baronia further stated that any of the alleged actions—the striking with a hand, a pistol, a bat, or kicking Garibaldi in the head—could result in and cause serious brain trauma and potentially fatal injuries. Dr. Krouse testified that these actions could not be distinguished from each other as being the sole cause of Garibaldi's fatal injuries. Furthermore, Dr. Baronia testified that striking a person after he is unconscious will produce a heightened risk of other brain injuries to that person. The official cause of Garibaldi's death was determined to have been blunt force trauma to his head, which ultimately caused massive internal cerebral hemorrhaging and intracranial swelling. According to Dr. Baronia, the internal bleeding in Garibaldi's brain had commenced within twenty-four hours of his death.

Here, the evidence shows that Appellant, and others with whom Appellant was a party, subjected Garibaldi to a vicious, brutal beating that resulted in Garibaldi's eventual death. As we have said, this is not a circumstance in which the victim only sustained "bodily injuries." Without question, the multiple injuries inflicted upon Garibaldi by Appellant and others were beyond serious. We have thoroughly reviewed the record and hold that the evidence presented at trial does not rise to a level or provide a basis that would permit a rational jury to find that, if Appellant is guilty, he is guilty only of the lesser included offense of assault. *Safian*, 543 S.W.3d at 219; *Rice*, 333 S.W.3d at 145. Furthermore, no evidence was presented to establish that the requested lesser included offense of assault was a valid, rational alternative to the indicted offense of murder to which Appellant was

convicted. Again, the second prong of the analysis cannot be satisfied. Therefore, the trial court was not required to submit, and did not err when it correctly refused to instruct the jury on, the requested lesser included offense of assault. Accordingly, we overrule Appellant's second issue on appeal.

### C. Harm/Due Process

Finally, in his third issue, Appellant asserts that the trial court's refusal to instruct the jury on the requested lesser included offenses of unlawful restraint and assault was harmful and violated his rights to due process and to a fair trial. We disagree.

In reviewing alleged jury charge error, we first must determine whether the charge contained actual error. *Phillips v. State*, 463 S.W.3d 59, 64 (Tex. Crim. App. 2015) (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)); *Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Garcia v. State*, 592 S.W.3d 590, 596 (Tex. App.—Eastland 2019, no pet.). If no error occurred, our analysis ends. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). However, if actual error is present, we must next determine whether the error resulted in sufficient harm to require reversal. *Phillips*, 463 S.W.3d at 64–65; *Ngo*, 175 S.W.3d at 743–44; *Abdnor*, 871 S.W.2d at 731–32; *Garcia*, 592 S.W.3d at 596. In this case, because Appellant contends that the trial court erred when it refused to instruct the jury on these requested lesser included offenses, any alleged charge error would be subject to an *Almanza* harm analysis. *Saunders*, 840 S.W.2d at 392; *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

In light of our disposition of Appellant's first and second issues, and for the reasons we have expressed above, we cannot conclude that Appellant was either harmed, denied a fair trial, or deprived of his right to due process by the trial court's proper refusal to charge the jury as Appellant requested. In fact, no harm or due

19

process violation could ever exist because the evidence presented at trial does not support the submission of either unlawful restraint or assault. Irrespective of Appellant's assertions, the fairness of his trial was not compromised.

Nevertheless, it should be noted that, in Cause No. 5693, even though the trial court refused Appellant's requests to instruct the jury on the lesser included offenses of kidnapping and unlawful restraint, on appeal Appellant only challenges the trial court's refusal to instruct the jury on the even lesser offense of unlawful restraint. *See* TEX. R. APP. P. 38.1. We cannot say, and will never know, if the jury in this case, based on the evidence presented at trial, would have convicted Appellant of the lesser offense of kidnapping had the jury been so charged. Such speculation is not before us and is of no consequence to our analysis. Of significant consequence, however, is that the evidence in the record does not establish unlawful restraint as a valid, rational alternative to the charged offense of aggravated kidnapping.

Moreover, in Cause No. 5694, the trial court's charge included an instruction for the jury to consider the lesser included offense of aggravated assault, which "lies between" the offenses of assault and murder.[6] *See Flores v. State*, 245 S.W.3d 432, 439 (Tex. Crim. App. 2008) (citing *Jackson v. State*, 992 S.W.2d 469, 474–75 (Tex. Crim. App. 1999)). Appellant contends that the "lies between" rule should not foreclose an assault instruction in this case because the evidence that supports an assault submission differs from the evidence that would support an aggravated assault submission. In support of his argument, Appellant cites to two cases that address whether lesser-included-offense instructions for both theft and aggravated assault were warranted, since aggravated assault lay between theft and the charged offense of aggravated robbery. *See Hudson v. State*, 449 S.W.3d 495, 499 (Tex.

---

[6]*See Hayward*, 158 S.W.3d at 479; *Forest v. State*, 989 S.W.2d 365, 367–68 (Tex. Crim. App. 1999) (holding that aggravated assault can be a lesser included offense of murder).

20

Crim. App. 2014); *Sweed v. State*, 351 S.W.3d 63, 69 (Tex. Crim. App. 2011). Contrary to Appellant's assertion, the holdings in *Hudson* and *Sweed* are inapplicable and clearly distinguishable.

Here, the statutory elements of assault and aggravated assault were each contained within the offense of murder as it was charged in the indictment in Cause No. 5694. Furthermore, the jury was able to consider the lesser included offense of aggravated assault in arriving at its verdict. As such, based on the facts of this case, and in light of the jury's verdict to convict Appellant of murder rather than the submitted lesser included offense of aggravated assault, the trial court's proper refusal to charge the jury on the even lesser offense of assault did not, and could not, harm Appellant or violate his rights to due process or to a fair trial. *See Masterson v. State*, 155 S.W.3d 167, 171–72 (Tex. Crim. App. 2005); *see also Hardeman v. State*, 556 S.W.3d 916, 923–24 (Tex. App.—Eastland 2018, pet. ref'd); *Lopez v. State*, 2012 WL 3129160, *3 (Tex. App.—Eastland Aug. 2, 2012, pet. ref'd); *Levan v. State*, 93 S.W.3d 581, 584–87 (Tex. App.—Eastland 2002, pet. ref'd). Accordingly, we overrule Appellant's third issue on appeal.

### III. *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE

April 8, 2021

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.