

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-23-00193-CR

CECIL RAY KING, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Marion County, Texas
Trial Court No. F15400

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

Cecil Ray King was at the wheel of his jeep. Robert Webster was on foot. Webster was killed by a blow from King's jeep. It happened in Webster's yard, immediately after King and Webster had quarreled inside Webster's house. That much was undisputed at trial.

Beyond that, the jury heard competing versions of the events of July 21, 2021, at 409 Patillo Road in Marion County, Texas. Under one version, King deliberately ran Webster down. Under another version, Webster was the aggressor and "got himself rolled over" when he fell off the side of King's jeep.

A Marion County jury found King guilty of the murder of Webster. *See* TEX. PENAL CODE ANN. § 19.02 (Supp.). The jury assessed King's punishment at life in prison.

On appeal, King raises four points of error: (1) the evidence is legally insufficient to support the murder conviction, (2) the trial court erred by refusing to charge the jury on the lesser-included offenses of manslaughter and criminally negligent homicide, (3) the trial court erred in refusing to charge the jury on the justification defense of self-defense, and (4) his trial counsel was ineffective because he failed to request a sudden-passion instruction during punishment.

Upon review, although we find that the evidence was sufficient to support King's murder conviction, we reverse the trial court's judgment because the trial court committed harmful error by not submitting a jury instruction on the lesser-included offense of manslaughter.

## I. Factual Background

### A. Scene at 409 Patillo Road

On July 21, 2021, officers with the Marion County Sheriff's Office (MCSO) were dispatched to 409 Patillo Road in Marion County, Texas.[1] Deputy Thomas Edwards was the first to arrive at the scene.[2] He described observing "[a] gentleman laying on the side of the road, just off the roadway. He was bleeding." Edwards described the man as having a "big gash in his left groin," "a big mark on his abdomen," and an injury to his arm.

After Edwards arrived, Deputy Michael Williams with the MCSO arrived at the scene. Upon arrival, Williams observed two men sitting under a tree. The victim, Webster, "had a lot of blood coming from his left leg." The other man was Lindsay, who "kind of squatted down behind Mr. Webster" and was "holding him up." Although conscious at the time of the deputies' arrival, Webster was mostly incoherent.[3]

Upon examining the area around Webster and Lindsay, Deputy Williams also noticed "tire tracks in the grass between the first house and Mr. Webster's house." At the scene, "[t]here was shattered glass approximately 400 to 500 feet from Mr. Webster's house." "There was a mirror housing -- the actual mirror was busted, the glass, and that was it."[4] By 7:19 p.m. on July 21, Webster was airlifted to a hospital.

---

[1]Around 6:09 PM, Dennis Lindsay, Webster's roommate, reported the incident to 9-1-1 dispatch in Marion County. Cass County originally received the call and then transferred it to Marion County.

[2]The trial court admitted Edwards's body camera footage from July 21 that was consistent with his testimony.

[3]Upon his later admission to the hospital, Webster was found "to be inebriated and high on methamphetamine[]."

[4]That was later determined to be the driver's side mirror.

3

## B. Investigation Into King

The deputies investigated the incident. Lindsay was the only eyewitness to the incident, apart from the driver and Webster. Lindsay identified the jeep that hit Webster and identified the driver as "Cecil Ray" or "Ray Cecil."[5] Immediately after the incident, Lindsay stated that King hit Webster "on purpose." Lindsay stated that King came back and forth several times and ultimately "went up and he spun the jeep around" and "swerved over to hit [Webster]." The officers began investigating King and put out a "BOLO" for his jeep.

After Webster was stabilized and airlifted out of the area, Deputy Edwards traveled to King's house. At that house, he located King's vehicle, a 2021 Jeep Gladiator. Upon inspection, officers found that King's vehicle was missing its driver's side mirror and window glass.

The officers detained King. At that time, Deputy Edwards "could smell alcohol about his person." Edwards did not observe any injuries on King and did not find any weapons or knives in the vehicle. Edwards described King's demeanor as "normal," and King did not seem upset or bothered by the incident. Chief Florentino Perez[6] of the Jefferson Police Department (JPD) also arrived at the scene of the incident. He confirmed that the driver's side window was broken out.

## C. King's Version of Events

While he was being transported and after he was detained on July 21, King discussed the incident with Deputy Edwards. That discussion was admitted into evidence during the trial. King did not deny hitting Webster. Instead, King defended his actions, explained his behavior,

---

[5]The driver was ultimately identified as King.

[6]The trial court admitted Chief Perez's body-camera footage during the trial.

and claimed Webster attacked him, attempted to cut him with a butcher knife, and hit him in the jaw. He claimed that he was just trying to get out of Webster's house and was not trying to cause problems.

The next day, on July 22, while he was detained, King again provided his version of the events to the investigators. The trial court admitted that recording into evidence during the trial. King stated that, on July 21, Webster was at work, and King planned to come by to "smoke a joint with [Webster]." He got some marihuana and came to see Webster. He said he and Webster got into a verbal altercation. Webster then "pulled two big butcher knives out." King claimed Webster then punched him in the jaw.

After that, King started to head out the door, and Webster followed him with the butcher knives. Then, Webster started "throwing butcher knives" at King. King then got into his vehicle. King claimed Webster followed him to his vehicle and started "beating" his vehicle with the butcher knives.

King said he tried to get away from Webster. He also claimed Webster broke King's driver's side window. King drove back and forth by Webster's house trying to get Webster off his vehicle but stated he only "turned around one time." According to King, while he attempted to leave, Webster continued to attack him, so he "punched" or accelerated the jeep, hit Webster, and went straight home.

King stated that Lindsay did not witness the entire incident because he was not outside the entire time. King stated that Lindsay went inside at the time Webster broke King's window

5

and near the time King hit Webster. King said that, as he was leaving the scene, Lindsay came outside "with a double-barreled shotgun."

At some point after he got home, King called 9-1-1. The State admitted a recording of that call from King during the trial. That call reflects that, at 6:42 p.m. or 6:49 p.m.,[7] after the incident, King reported that Webster attacked him with a butcher knife. During that call, King also said that Webster "chased [him] down and started beating on [his] vehicle." King stated that only he, Webster, and Lindsay were at the house when those events transpired.

### D. Lindsay's Version of Events

On the night of July 21, Deputy Edwards again questioned Lindsay about the incident. Lindsay stated that he had been friends with Webster for "thirty plus years." Lindsay described King as being "paranoid" and having some type of "mental problem." While inside the house, Webster and King got into an argument, and Webster had asked King to leave multiple times. Ultimately, Webster planned to physically remove King from his home. After attempting to remove him, King continued verbally threatening Webster and still would not leave.

At trial, Lindsay testified that King went back and forth down the road in front of Webster's house, and Webster "threw something" at King, which "landed in the back of the jeep." The object Webster threw "made a loud thud." King still did not leave, and he and Webster ended up in a brief physical altercation outside the jeep. Thereafter, Lindsay stated that King got back in his jeep, drove away, and finally turned his jeep around and, "like a bat out of

[7]The appellate record is unclear as to the timing of the call. Based upon the record, the call was either at 6:42 p.m. or 6:49 p.m.

hell," drove toward Webster and "swerved over [to him] and hit him with the . . . left side of [his] bumper."

Lindsay testified about the incident as follows: "The jeep took off. It was headed towards me, headed in the Avinger direction. From a standstill, dead of heat, it was as fast as the jeep would go. [King] veered off the road and hit [Webster]." Lindsay reported King's speed was "40 to 50 miles an hour at the time that he hit [Webster]." Lindsay also testified King "hit . . . Webster from behind."

After hitting Webster, Lindsay testified that King did not stop to check on Webster:

> Cecil . . . never slowed down. He never got out of it, that I could tell, one bit. He drove by me as close to me as to you and looked me right in the face, stared me right in the eyes. And I took from that he was letting me know, "Yeah, I just did that."

Lindsay testified that Webster only had a knife inside the house, and he did not take a knife outside the house. Also, as a part of his testimony, Lindsay admitted that he knew King, did drugs with Webster and King, had a prior felony conviction, and was on community supervision.

The day after the incident, on July 22, 2021, Webster died.

### E.    Comparing King's Version of the Events to the Evidence

#### 1.    Webster's Purported Knife Attack

King claimed Webster attacked him with knives. No knives were found in or around King's vehicle, and no knives matched King's butcher knife description.[8] King claimed Webster

---

[8]As a part of their investigation, the deputies questioned King's parents. While questioning King's parents, King's father provided them with a knife that he claimed Webster used during the incident to attack King. King's father purportedly removed the knife from the jeep before the officers arrived. King's father first brought one knife out from his house. Eventually, King's father went in, got his knife block, brought "all his knives out," and gave the officers a different one for fingerprinting. None of those knives had identifiable fingerprints.

beat his vehicle with those knives. Specifically, King claimed Webster "chopped all over [his] whole vehicle with butcher knives." An investigator with the JPD on the day of the incident, Dustin Hayes, testified at the trial regarding any potential knife marks on King's vehicle. He testified that he found no significant scratches or knife marks on King's vehicle and that there were no marks on the vehicle that he thought might be caused by a knife.

King claimed Webster beat in the driver's side window and mirror with the knives. During the trial, however, Chuck Rogers, a criminal investigator with the MCSO, testified regarding the window glass. Rogers testified that the "window glass was found some 564 feet from [Webster]." Further, the forensic pathologist who performed Webster's autopsy, Dr. Amy Gruszecki, also testified at the trial in this matter. Dr. Gruszecki explained that individuals cut with broken window glass often receive "dicing lacerations." During her autopsy examination of Webster, however, she noted he had no dicing lacerations on either of his hands.

King claimed that, while they were in the house, Webster hit him in the jaw. Deputy Edwards, however, testified that, after detaining King, he observed that King did not have any redness or swelling on his jaw. Edwards further testified that King had no observable injuries or blood on him.

### 2. Tire Tracks at the Scene

It is undisputed there were multiple tire tracks at the scene, within a large area around Webster's house. King described a relatively limited area for the altercation, with Webster holding onto his vehicle while King drove around Webster's yard, purportedly trying to get Webster off of his vehicle. King described that as "three or four times back and forth" near

8

Webster's house. King claimed it was "back and forth right there." Ultimately, King claimed he only turned around "one" time.

To explain those more extensive tire marks, King claimed in his interview on July 22 that some of the tire tracks could be attributed to him having "spun out" in Webster's yard earlier on July 21. King claimed that he had done that "two or three times" earlier that day. King said he had spun out in Webster's yard because he had been waiting for Webster earlier in the day, and King claimed no one was around when he did that. King claimed he "sat out there for two or three hours" in the yard, waiting for Webster. No testimony corroborated King's claim on that issue, and Deputy Edwards testified that, on July 21, it was an extremely hot and humid day.

### 3. King's 9-1-1 Call

After the incident, King claimed he went "straight up the road" to get away from Webster and called 9-1-1. King's statement indicates the 9-1-1 call was made immediately after the incident with Webster. King claimed that he did not leave the scene at first partly because he was "calling 9-1-1 right then." Based upon the record, however, King waited until at least 6:42 p.m. to call 9-1-1.[9] That was at least over thirty minutes after Lindsay's call to 9-1-1, which was transferred to Marion County at 6:09 p.m.

Notably, King was aware that his 9-1-1 call would be recorded; in his custodial interview the next day, King stated that was an "exact recording" of his version of events. In his 9-1-1 call, King stated his tire "ran [Webster] over." During her testimony, however, Dr. Gruszecki

---

[9]During his interview on July 22, King backed off this claim and stated that he did not immediately call 9-1-1 because he was "in fear for [his] life."

testified Webster's injuries were not consistent with being crushed or being run over by a tire and that there were "no tire tread mark[s]."

## II.     The Evidence Is Legally Sufficient to Support King's Murder Conviction

As his first point of error, King argues there is legally insufficient evidence to support his murder conviction.

### A.     Standard of Review

"[L]egal sufficiency review ensures that the State carries its burden at trial to prove each element of the offense beyond a reasonable doubt." *Baltimore v. State*, 689 S.W.3d 331, 340–41 (Tex. Crim. App. 2024).[10] "Evidence supporting a conviction is legally sufficient if a rational trier of fact could have found that the defendant committed each element of the offense beyond a reasonable doubt." *Id.* at 340. This is done using a "hypothetically correct jury charge," in other words, an imaginary charge that accurately sets out the elements of the crime, regardless of whether the charge actually given to the jury did so. *Id.* at 341. In conducting this review, we "consider the evidence in the light most favorable to the verdict," *id.*, bearing in mind that "reviewing courts may not substitute their judgment for that of the fact[-]finder by re-evaluating the weight and credibility of the evidence," *id.* at 342.

### B.     Standard for Murder

Under Texas law, a person is guilty of murder if the person "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act

---

[10]This case does not require the examination of every wrinkle of the standard of review; *Baltimore* sets out the standard of review more thoroughly than is done here, and in the process, collects prior cases on the standard. *See Baltimore*, 689 S.W.3d at 340–42.

clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1)–(2). Under the Texas Penal Code, "[a] person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a). "A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist." TEX. PENAL CODE ANN. § 6.03(b). Further, "[a] person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.*

## C. Analysis

There was evidence that King deliberately ran Webster down and killed him. Enough to convict King beyond a reasonable doubt. From the evidence set out above, the jury could have rationally believed that King intentionally or knowingly killed Webster. Likewise, the jury could have rationally believed that King intended to cause Webster serious bodily injury and that King committed an act clearly dangerous to human life (running Webster over), which caused Webster's death.

King claimed otherwise, but the jury was not required to believe him.

The evidence was legally sufficient to convict King of Webster's murder.

## III. The Trial Court Was Required to Charge the Jury on the Lesser-Included Offense of Manslaughter

King also argues that the trial court erred by refusing to charge the jury on the lesser-included offense of manslaughter. King complains his counsel submitted an instruction for

11

manslaughter but that that request was denied.  King claims that was harmful error that requires reversal.  We agree.

## A.     Standard of Review

*Ransier v. State* states,

> A defendant is entitled to submission of a lesser-included offense only if the following two-pronged test is satisfied:  (1) the requested lesser offense is in fact a lesser-included offense of the charged offense, and (2) there is some evidence in the record that would permit . . . a jury to rationally find that, if the defendant is guilty, he is guilty only of the lesser-included offense.

*Ransier v. State*, 670 S.W.3d 646, 650 (Tex. Crim. App. 2023) (plurality op.).

There is no dispute, and the State concedes, that manslaughter is a lesser-included offense of murder.  *See Lugo v. State*, 667 S.W.2d 144, 147 (Tex. Crim. App. 1984) (recognizing that "manslaughter requires a lesser culpable mental state on the part of the defendant" such that it is a lesser-included offense of murder); *see also* TEX. PENAL CODE ANN. § 19.04 (Supp.).

Regarding the second prong, i.e., the "guilty only" inquiry, "[t]he test determines whether there is evidence at trial that casts reasonable doubt upon the greater offense, not whether the evidence is legally insufficient to establish it." *Wade v. State*, 663 S.W.3d 175, 182 (Tex. Crim. App. 2022).  However, "the possibility that inculpatory evidence [of the greater offense] could be disbelieved is not enough to raise a lesser-included offense." *Ransier*, 670 S.W.3d at 651. Instead, "there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Id.* at 650 (quoting *Bullock v. State*, 509 S.W.3d 921, 925 (Tex. Crim. App. 2016)).  "Unless the evidence presented is subject to different interpretations consistent with either the greater or

12

lesser-included offenses, evidence directly germane to a lesser-included offense exists only if there is 'affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense.'" *Id.* (quoting *Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012)). "We consider all of the evidence admitted at trial . . . ." *Goad v. State*, 354 S.W.3d 443, 446 (Tex. Crim. App. 2011). That said, "a defendant's testimony alone may be sufficient to raise the issue." *Wade*, 663 S.W.3d at 181. "[W]e view the evidence in the record in a light most favorable to giving the instruction, not in a light most favorable to the verdict." *Id.* at 183. The evidence must "present the [lesser-included offense] as a valid, rational alternative to the greater offense." *Chavez v. State*, 666 S.W.3d 772, 777 (Tex. Crim. App. 2023). However, "[e]ven a scintilla of evidence is sufficient, no matter how controverted or incredible." *Id.*[11] This is so even when the testimony is controverted by "overwhelming" expert testimony. *Wortham v. State*, 412 S.W.3d 552, 558 (Tex. Crim. App. 2013) ("The court of appeals' and the State's reliance on the overwhelming medical evidence presented in this case is in error. If a defendant can point to more than a scintilla of evidence supporting the lesser-included offense instruction—even evidence that is controverted or weak—he is entitled to the instruction.").

## B. Standard for Manslaughter

For manslaughter, "[a] person commits an offense if he recklessly causes the death of an individual." TEX. PENAL CODE ANN. § 19.04(a). "A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of

---

[11]*But see Ritcherson v. State*, 568 S.W.3d 667, 678 (Tex. Crim. App. 2018) (finding that lesser-included-offense instruction was not required because "[i]t stretches credulity to argue that a person's involuntary, instinctual response to being hit on the head is to stab that other person in the chest").

but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." TEX. PENAL CODE ANN. § 6.03(c). Further, "[t]he risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all circumstances as viewed from the actor's standpoint." *Id.*

There must be some evidence germane to recklessness for a manslaughter charge and not just intentional conduct. *See, e.g.*, *Cavazos*, 382 S.W.3d at 385 (recognizing that "pulling out a loaded gun in a room full of people" and "shooting directly at a person" is not just "reckless" even when the defendant later told someone he did not intend to shoot anyone).

### C.    Analysis

The record is replete with eyewitness testimony, expert testimony, and physical evidence that contradicts King's version of events.

Even so, the lesser-included-offense instruction should have been given.

"If a defendant can point to more than a scintilla of evidence supporting the lesser-included[-]offense instruction—even evidence that is controverted or weak—he is entitled to the instruction." *Wortham*, 412 S.W.3d at 558; *see Wade*, 663 S.W.3d at 181 (recognizing a "defendant's testimony alone may be sufficient"); *Chavez*, 666 S.W.3d at 777 (holding "no matter how controverted or incredible").

Considering King's version of events, he had a chance to get away but did not do so. According to his statement given July 22, King had fled from a knife-wielding Webster across Webster's yard. King had gotten safely into his vehicle and was backing up. Webster was

14

kicking King's vehicle. Webster was on the side of the vehicle at one point, but as King went to go forward, Webster moved to the front of the vehicle and continued kicking and beating on King's vehicle. Upon hearing this from King, the investigator observed: "If he's kicking the side of your truck, beating the side of your truck, you could have drove on down the road then. Because he's off the vehicle." King then spoke of the time when Webster was on the side of the vehicle. But the investigator persisted: "When he's kicking you, you could have drove off." To which King responded, "Yeah." The investigator then asked King why he did not drive off when he had the chance to do so. King responded, "Because this dude just assaulted my vehicle." This was at a point in time when King felt safe in his vehicle.

In other words, King, by his own admission, *chose to engage* with Webster *even after*, in King's telling, Webster had hit him in the jaw, chased him with knives, and beaten on his vehicle. King did so "[b]ecause this dude just assaulted [his] vehicle."

That aspect of King's testimony "is subject to different interpretations consistent with either" murder or manslaughter. *Ransier*, 670 S.W.3d at 650. It goes to King's state of mind. Perhaps King had an urge to harm Webster, to kill him. Perhaps King had a desire to threaten Webster, to back him down. In any event, we consider "all the evidence admitted at trial." *Chavez*, 666 S.W.3d at 777. And we do so "in a light most favorable to giving the instruction." *Wade*, 663 S.W.3d at 183.

At trial, King requested a jury instruction on manslaughter, but that request was denied. In light of the authorities cited, we find that King was entitled to an instruction on the lesser-included offense of manslaughter.

15

This was harmful under a "some harm" *Almanza* analysis. *See Saunders v. State*, 913 S.W.2d 564, 572 (Tex. Crim. App. 1995) (recognizing "where the jury's only options are to convict for the greater offense or acquit the fact that a lesser included offense is raised by the evidence but not included in the jury instructions will be sufficient to demonstrate 'some' harm"); *Nangurai v. State*, 507 S.W.3d 229, 234 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) ("[O]rdinarily, if the absence of the lesser-included offense instruction left the jury with the sole option either to convict the defendant of the charged offense or to acquit him, some harm exists.").

Because there was harmful error, we must reverse the trial court's judgment.[12]

## IV. Disposition

Because King's version of events is consistent with manslaughter, because the trial court denied King's request that the jury be given the option to convict him of manslaughter instead of murder, and because *Chavez* and other cases have held that the option must be given even when the evidence of the lesser offense is "controverted or incredible,"[13] we reverse the trial court's judgment and remand this case for further proceedings consistent with this opinion. *Chavez*, 666 S.W.3d at 777; *see* TEX. R. APP. P. 43.2(d).

---

[12]As a final point, we do not find that the trial court erred in failing to submit the lesser-included offense of criminally negligent homicide as there was no evidence King was only criminally negligent in killing Webster. *See* TEX. PENAL CODE ANN. § 19.05. Further, we find a self-defense instruction was not warranted, as there was no evidence King's use of deadly force was "immediately necessary" in order "to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE ANN. § 9.32(a)(2). Although King claimed he was being attacked by Webster, King was in his vehicle and had the opportunity to leave after their dispute began.

[13]*Chavez*, 666 S.W.3d at 777.

16

Jeff Rambin
Justice

Date Submitted:   May 24, 2024
Date Decided:    July 31, 2024

Do Not Publish

17