

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0021-17

### KAITLYN LUCRETIA RITCHERSON, Appellant

### v.

### THE STATE OF TEXAS

### ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
### FROM THE THIRD COURT OF APPEALS
### TRAVIS COUNTY

**HERVEY, J., delivered the opinion of the unanimous Court.**

### O P I N I O N

The issue in this case is whether Appellant, Kaitlyn Ritcherson, was entitled to a

lesser-included offense instruction on manslaughter during her second murder trial. The

trial court denied Appellant's request, and the court of appeals affirmed. We will affirm

the judgment of the court of appeals.

### BACKGROUND & PROCEDURAL HISTORY

This case involves a stabbing after an Austin nightclub closed for the evening.

Fatima Barrie (Fatima),[1] the victim, was at a downtown Austin nightclub with her friend

Jaime Hopkins (Jaime). Jaime's boyfriend, Kelvin Jones (Kelvin), and his friend, Ronald

Pace (Ronald) were also there. While everyone was inside the club, Ronald got into a

brief argument with Chris Carson (Chris). The two went their separate ways after a few

minutes, but about 20 or 30 minutes later when the nightclub was closing and everyone

was leaving, they saw each other and began to argue again. Outside of the club, Chris was

with his group of friends: Appellant,[2] Ashley York (Ashley), and Ryan Moore (Ryan).

Ronald was with Kelvin, Fatima, and Jaime. Kelvin tried to break up the argument

because he was afraid that Ronald and Chris would start "throwing punches," but he was

unable to get the two to back down. As Ronald and Chris continued to argue, Appellant

and Fatima began to argue. During the confrontation between them, Appellant stabbed

Fatima in the chest. Fatima later died from her injuries.

Initially, Appellant was arrested for aggravated assault with a deadly weapon, but

she was later charged with murder under Section 19.02(b)(1) & (b)(2) after Fatima died

from her wounds.[3] During the first murder trial, the judge declared a mistrial because the

---

[1]Because numerous witnesses share the same last name, we use only their first names.

[2]Appellant was at the club to pick up one of her friends, Lynsie Carson. Lynsie was kicked out of the club because she was inebriated. Apparently, she kept falling down in the club and kicking her legs and feet like she was trying to make a snow angel even though there was no snow.

[3]Section 19.02(b)(1) & (b)(2) state that,

(b) A person commits an offense if he:

jury deadlocked. Eleven jurors voted to convict, and one juror voted to acquit. But Appellant was brought to trial again on the same charges. The indictment alleged that Appellant,

> did then and there intentionally and knowingly cause the death of Fatima Barrie, by stabbing Fatima Barrie with a knife or another object unknown to the grand jury, each of which was a deadly weapon, during the commission of this offense.
>
> \*      \*      \*
>
> It is further presented that [Appellant] . . . did then and there with intent to cause serious bodily injury to Fatima Barrie, commit an act clearly dangerous to human life that caused the death of Fatima Barrie, by stabbing Fatima Barrie with a knife or another object unknown to the grand jury, each of which was a deadly weapon, during the commission of this offense[.]

During the charge conference, Appellant requested lesser-included offense instructions on manslaughter and negligent homicide, but the trial court denied those requests. The jury convicted her and sentenced her to 25 years' confinement. She was not fined.

Appellant argued on appeal that the trial court erred when it did not instruct the jury on manslaughter. The court of appeals affirmed the judgment of the trial court because the jury could not have found Appellant guilty of only manslaughter. *Ritcherson v. State*, 476 S.W.3d 111, 127 (Tex. App.—Austin 2015). We granted Appellant's

---

(1) intentionally or knowingly causes the death of an individual; [or]

(2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE § 19.02(b)(1) & (2).

petition for discretionary review, which asks whether the court of appeals erred because it did not consider this Court's decision in *Saunders v. State*, 840 S.W.2d 390 (Tex. Crim. App. 1992) (per curiam), when deciding whether Appellant was entitled to a lesser-offense instruction.[4]

## LESSER-INCLUDED OFFENSES

Lesser-included offenses are defined in the Texas Code of Criminal Procedure, which states that,

> An offense is a lesser included offense if:
>
> (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;
>
> (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;
>
> (3) it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or
>
> (4) it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. art. 37.09.

We use a two-step analysis to determine if a defendant is entitled to a lesser-offense instruction. *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App. 1993).

---

[4]The ground for review states, "The Court of Appeals failed to apply this Court's decision in *Saunders v. State*, 840 S.W.2d 390 (Tex.Cr.App. 1992) in determining that petitioner was not entitled to a lesser-included charge on manslaughter when the jury could reasonably have interpreted petitioner's *mens rea* as reckless about causing death."

First, we compare the statutory elements of the alleged lesser offense and the statutory elements and any descriptive averments in the indictment. *Bullock v. State*, 509 S.W.3d 921, 924 (Tex. Crim. App. 2016); *McKithan v. State*, 324 S.W.3d 582, 587 (Tex. Crim. App. 2010). Second, there must be evidence from which a rational jury could find the defendant guilty of only the lesser offense. *Bullock*, 509 S.W.3d at 925; *Guzman v. State*, 188 S.W.3d 185, 188–89 (Tex. Crim. App. 2006). That requirement is met if there is (1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense. *Saunders v. State*, 840 S.W.2d 390, 391–92 (Tex. Crim. App. 1992). The evidence raising the lesser offense must be affirmatively in the record. That is, a defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be "directly germane to the lesser-included offense . . . ." *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997). We consider all the evidence admitted at trial, not just the evidence presented by the defendant, and if there is more than a scintilla of evidence raising the lesser offense and negating or rebutting an element of the greater offense, the defendant is entitled to a lesser-charge instruction. *Roy v. State*, 509 S.W.3d 315, 317 (Tex. Crim. App. 2017); *Bignall v. State*, 887 S.W.2d 21, 23 (Tex. Crim. App. 1994). It does not matter whether the evidence is controverted or even credible. *Banda v. State*, 890 S.W.2d 42, 60 (Tex. Crim. App. 1994). If the jury is

charged on alternate theories, the second prong of the lesser-offense test is met "only if there is evidence which, if believed, refutes or negates every theory which elevates the offense from the lesser to the greater." *Arevalo v. State*, 970 S.W.2d 547, 548 (Tex. Crim. App. 1998).

## ANALYSIS

We granted discretionary review to determine if the court of appeals failed to consider whether Appellant was entitled to a manslaughter instruction under *Saunders*. The State argues that we should overrule *Saunders* because it was poorly reasoned, but we do not address that threshold argument because Appellant was not entitled to the manslaughter instruction even in light of *Saunders*. For that reason, we will affirm the judgment of the court of appeals.

### a. Trial Evidence

This case involves numerous witnesses, some of whom have the same last name. For the convenience of the reader, we address the witnesses in four categories: (1) people with Fatima,[5] (2) people with Appellant,[6] (3) bystanders,[7] and (4) medical and police personnel.

### 1. People with Fatima

---

[5]Jaime and Kelvin were with Fatima.

[6]Chris, Ryan, Ashley, and Shronda Dobin were with Appellant.

[7]Oghenebrohien Uwalogho, Stefne Henderson, and Britney Carson were bystanders who testified.

### I. Jaime Hopkins

Jaime testified that, when she and Fatima left the club, they saw Kelvin, Ronald, and a bunch of people outside arguing. She did not know who the other people were, but it looked like a group of guys and a girl. Jaime said that the altercation broke up quickly, and at about that same time, she noticed two girls walking toward her and Fatima saying disparaging things. (Those girls were Appellant and Ashley.) Jaime testified that she grabbed Fatima's arm, and they started to walk away, but Appellant pulled Jaime's hair. Kelvin intervened, grabbing Jaime and moving her away from Appellant. Jaime saw Appellant waiving a hand in the air with something that looked like a knife. She thought that the blade of the knife was about 2 ½ inches long and that Appellant was going to try to "cut her or something." After Kelvin moved Jaime away from the confrontation, he also moved Fatima away from the confrontation. From there, the three turned to walk away. Fatima stumbled and collapsed on the ground. Jaime saw blood dripping from Fatima's leg and noticed that her eyes were rolled back in her head. Although Jaime saw the knife, she did not see Appellant stab Fatima.

### ii. Kelvin Jones

Kelvin testified that he went to the club with his two friends Ronald and Rory Alexander and that, while he was there, he saw Ronald and Chris arguing with each other.[8] According to Kelvin, the two went their separate ways, but five to ten minutes

---

[8]Ronald and Chris had a "run in" at a mall where Chris saw his girlfriend with Ronald, and according to Chris, Ronald was harassing her.

before the club closed, Ronald and Chris saw each other and started arguing again. The argument continued into the street as everyone left the club. Kelvin said that he pushed Ronald and Rory away from Chris, and as Ronald and Rory began to walk away, Kelvin heard a woman say, "Get these puppies out of here." Kelvin testified that Jaime was upset when she heard the comment because she thought that the woman was talking to Kelvin. To defuse the situation, Kelvin pushed Jaime away, but Appellant pulled Jaime's hair. Kelvin forced Appellant to let go, and he shoved Jaime toward Ronald and Rory, who were already walking away. Kelvin then saw Fatima approach Appellant. Still trying to play the peacemaker, Kelvin also shoved Fatima away from the confrontation, and while he was doing so, he saw that Appellant was holding one of her arms up, and he thought that she was swinging it at somebody. The three of them started to walk down the sidewalk, but Fatima collapsed after about five steps. Kelvin thought that Fatima had slipped, but he later realized that she had been stabbed. He did not see a knife or see Appellant stab Fatima.

## 2. People with Appellant

### I. Chris Carson

Chris testified that he argued with Ronald in the club and that the argument continued into the street. According to him, Kelvin got between them to break up the impending fight and to help settle their "beef" with each other. The next thing Chris saw was Fatima "com[ing] across" him with her hand raised. He thought that she was going to

hit him and that she had something in her hand, like a high-heel shoe, but Fatima swung past him and hit Appellant. After Fatima hit Appellant, and they crashed into each other, Chris said that Fatima slipped and fell. He could not see where Appellant or Fatima were after that because all of the people from the club were all over the street, so he left with his friends. He did not see the knife or see Appellant stab Fatima.

## ii. Shronda Dobin

Shronda testified that she was in the club with Ashley and Lynsie and that, at about 12:30 a.m., Lynsie was kicked out of the club because she was too intoxicated. Appellant drove to the club to pick up Lynsie, and when she arrived, Ashley and Appellant helped Lynsie into the car. According to Shronda, Ashley and Appellant left Lynsie in the car, and Ashley went back into the club, but Appellant waited outside. When the club closed and Shronda walked outside, she saw Appellant and asked her where her car was because she wanted to check on Lynsie. As Shronda was walking to Appellant's car, she heard Chris arguing with someone, but she did not hear about what or with whom because she was almost at Appellant's vehicle. Shronda did testify, however, that it was not unusual for Appellant to carry a pocket knife because she often wore hair extensions and that Appellant used the pocket knife to cut the extensions.

After Ashley and Appellant returned to the car, Ashley told Shronda that they had to go to the hospital because Appellant had been stabbed in the leg. Shronda was shocked and asked how it happened, but Appellant said that she did not know and refused to go to

the hospital, so they decided to go back to Ashley's apartment. On the way there, Appellant changed her mind and asked to go to the hospital.

### iii. Ryan Moore

Ryan testified that he went to the club that night with Chris and another friend but that he was not with the pair all night. While he was in the club, Ashley told him that she had seen Chris arguing with Ronald and that, later, when the club was closing and everyone was leaving, she saw them start to argue again. According to Ryan, he, Appellant, and Ashley were standing next to Chris outside of the club, and Fatima and Jaime were standing near Ronald and Kelvin. The next thing that Ryan saw was Fatima arguing with Ashley. He also saw Fatima take off one of her shoes and lunge at Appellant. Jaime pulled Fatima back before she hit Appellant, according to Ryan, but Fatima lunged at Appellant a second time. After Fatima lunged the second time, Ryan saw Appellant swing at Fatima from overhead. Appellant hit Fatima as Ryan was trying to pull Appellant back and Jaime was trying to pull Fatima back. Ryan characterized Appellant's overhead swing at Fatima as "like a reflex." He also said that it was a "reaction." Ryan testified that, after Appellant swung at Fatima, he saw a knife in her hand, and he started wrestling with her to take it. He told her to "let it go, let it go, come on, let's go." Appellant eventually dropped the knife, and Ryan kicked it away. He thought that the entire knife, including the handle, was between 4 ½ and 5 inches long. After the tussle, Ryan told Appellant and Chris that they needed to go. He also said that

Appellant was "shocked or confused" but that she went back to her vehicle. Ryan saw Fatima fall down twice and heard someone yell that she was bleeding before he and Chris left in their car.

### iv. Ashley York

Ashley testified that she was at the club with Shronda and Lynsie and that she called Appellant to help Lynsie after Lynsie was kicked out of the club. Ashley waited with Lynsie at the entrance to the club for Appellant, and once Appellant arrived at about 12:45 a.m., Ashley and Appellant helped Lynsie into Appellant's car. Afterward, Ashley went back into the club until it closed, and Appellant stayed outside. As Ashley was leaving the club, she bumped into Fatima, who was yelling at Chris while Chris and Ronald were arguing. The women apologized to each other, Ashley said, and Fatima continued yelling at Chris. Appellant asked Ashley if she was okay because she thought that Ashley and Fatima had gotten into an altercation. Fatima and Appellant then started yelling at each other, and as they argued, Ashley noticed a knife in Appellant's left hand, which was down by her side. When she saw it, she grabbed Appellant's right hand to pull her away from Fatima and the brewing conflict, and Ryan was trying to restrain her, but Appellant pulled her hand away from Ashley's and refused to leave. Ashley turned to walk back to Appellant's car, and as she was turning, she saw Fatima, who was holding a mobile phone in her hand, hit Appellant on her head.

By the time Ashley arrived at Appellant's car, Ashley said, Appellant had almost

caught up to her. When she did, Appellant told Ashley that she was bleeding. Ashley asked what happened, and Appellant told her that she did not know. After everyone got in the car—Ashley, Appellant, and Shronda—[9]Appellant showed Ashley and Shronda the stab wound on her leg. Shronda suggested that they go to the hospital, but Appellant refused. Instead, they drove to Ashley's apartment in South Austin. On the way there, Appellant started complaining that her leg hurt, and she asked to go to the hospital.

### 3. Bystanders

### I. Oghenebrohien Uwalogho

Oghenebrohien Uwalogho (Uwalogho) was at the club taking pictures. She said that she was one of the last people to leave the club, around 2:15 a.m. or so, and that when she did, a lot of people were milling around outside mingling. She also heard some people yelling at each other, which caught her attention. They turned out to be Chris and Ronald. According to her, the argument broke up shortly after she exited the club. After the confrontation between Chris and Ronald fizzled out, she saw some girls "jump into it." She could not hear what the girls were saying to each other, but she saw Appellant hold a knife up in the air. The next thing she saw was Ryan trying to restrain Appellant and Appellant walking back to her car a few moments later.

### ii. Stefne Henderson

Stefne Henderson also saw some of what happened after the club closed. She

---

[9]Lynsie was already in the car.

testified that she went to the club with her roommate and that, when the club closed, they went outside to wait for their ride. While they were waiting, Stefne noticed that Appellant, Chris, and Ryan were being loud, and she heard Chris yell, "If you're not in my crew, then you're going to get stepped on." She also saw Appellant start arguing before Fatima turned to walk away. At about that time, Stefne saw a knife in Appellant's hand and saw Appellant reach over Fatima's right shoulder from behind and stab Fatima in the chest. Afterward, Stefne testified, Appellant stumbled back, and Ryan fought Appellant for the knife. She eventually dropped it and walked away. After that Stefne and her roommate left with their ride.

### iii. Britney Carson

Britney Carson, Chris's little sister, testified that she was at the club for a friend's birthday party until it closed at 2:00 a.m. When she left the club, she saw Ashley and Appellant standing next to each other outside. According to Britney, Ashley was already arguing with a group of girls. Britney walked over and asked Ashley and Appellant if they needed a ride, but they demurred. The next thing Britney saw was a group of girls lunge towards Ashley and Appellant, and one of the girls, Fatima, who had a mobile phone in her hand, hit Appellant on the head. After Fatima hit Appellant, Britney saw Fatima fall to the ground and Appellant stumble back. Britney asked Ashley a second time if they wanted a ride to their car, and as she asked, she noticed a knife in Appellant's right hand. According to Britney, Fatima stood back up and told Appellant that she did not care that

Appellant had a knife and that she was still going to "kick her ass." After that, Britney said that "they clash[ed] together." Britney did not see anything else because she left at that point to find her brother who was also at the club that night.

*4. Medical & Police Testimony*

I. Medical Testimony

Fatima was taken to Brackenridge Hospital after she was stabbed. Doctor Charlie Ross was the trauma surgeon on duty. When he examined Fatima, he saw a wound that went into her chest and that was consistent with a stab wound. He put a finger in the wound and discovered that it went all the way to her heart. Dr. Ross performed emergency open-heart surgery, and when he opened her chest, he saw that the knife had punctured her pulmonary artery. He was able to get the bleeding under control by clamping the artery, and he was relieved by Doctor Stephen Dewan, a cardiothoracic surgeon. Dr. Dewan stitched the puncture so the clamp could be removed, but Fatima was brain dead and died a few days later. According to Dr. Dewan, based on the puncture wound, he thought that the knife blade would have to be between 2 and 2 ½ inches. Doctor Vickie Willoughby performed the autopsy, and she testified that the fatal wound tracked from left to right and that, based on the wound, the blade was probably at least about 2 ½ inches long.

Nurse Jenny Stepp was the triage nurse who examined Appellant at the hospital. Jenny asked Appellant if she knew who stabbed her, and initially, Appellant said that she

did not, but later she told Jenny that she stabbed herself in the leg.

ii. Police Testimony

Officer Justin Berry of the Austin Police Department was one of the first officers to arrive at the scene. When he arrived, he found Fatima in a lot of pain, and he saw a lot of blood. Another officer, Theresa Ann Jester, interviewed witnesses, one of whom told her that Fatima was bleeding from the upper-left chest area and that there was blood on the left side of her body and on the ground. Officer Michele Aparicio spoke to Jaime and Kelvin. Jaime told Aparicio that, after Kelvin moved her away from the confrontation, she turned back around and knew something had happened, but she was not sure what it was because she could not see well. According to Aparicio, Jaime told her that Fatima turned around to walk away, but she collapsed shortly thereafter.

Lieutenant Eric Miesse interviewed Appellant at the hospital. Appellant said that there was a fight outside of a club but that she did not know who stabbed her.[10] Homicide Detective Anthony Nelson was the lead detective. He testified that he went to the police station to interview people from the scene, including Appellant, who by that time had been released from the hospital and transported downtown. Appellant told Detective Nelson that she was "talking mess" to Fatima and that Fatima "charged her." Detective Nelson asked Appellant if she knew who stabbed her, but she said that she did not. According to her, she heard someone say, "Oh, my God, she has a knife," but by the time

---

[10]By the time Appellant told Lieutenant Miesse that she did not know who stabbed her, she had already told the triage nurse, Jenny, that she had accidentally stabbed herself.

she heard that, she had already been stabbed. When told that she was suspected of stabbing someone else, Appellant asked how she could have been holding the knife if she was the one who was stabbed. Before she was released, Detective Nelson asked Appellant if Fatima's blood would be on her, and she replied that it would not because she was not around Fatima.

## b. The Court of Appeals

The court of appeals correctly identified the issue in this case—whether Appellant had the intent to murder or only caused Fatima's death recklessly—but it appears to have applied legal-sufficiency law instead of lesser-included-offense law.[11] In that respect the

---

[11]For example, the court of appeals said that,

- "[A] jury could have reasonably inferred that [Appellant] stabbed [Fatima] in the manner suggested by [Stefne]";

- "[T]he jury could also have reasonably inferred from the testimony . . . that [Stefne] did see [Appellant] stab [Fatima] as [Fatima] was walking away but that [Stefne] incorrectly recalled which shoulder [Appellant] reached over";

- "[T]he jury was free to decide that [Appellant] intended to cause serious bodily injury to [Fatima] when she stabbed [Fatima] and that by stabbing [Fatima] in the chest, [Appellant] committed an act clearly dangerous to life that caused [Fatima]'s death.";

- "[T]he evidence presented during trial . . . would have allowed the jury to conclude that [Appellant] intended to kill [Fatima] by stabbing her in the chest regardless of whether the knife was small or large in size";

- "[T]he evidence from the witnesses would have allowed the jury to conclude[] that [Appellant] intended to cause serious bodily injury

court of appeals erred. The issue is not whether a rational jury could have found Appellant guilty of murder; it is whether a jury could have reasonably interpreted the record in such a way that it could find Appellant guilty of only manslaughter. *See Thomas*, 699 S.W.2d at 859 (when determining whether a defendant is entitled to an instruction on a lesser-included offense, the facts are viewed in the light most favorable toward submitting the lesser-included offense).

The court of appeals also erroneously relied on our decision in *Cavazos v. State*, 382 S.W.3d 377, 385–86 (Tex. Crim. App. 2012), when it held that Appellant had not shown that, if she was guilty, she was guilty of only manslaughter because the intent to kill could be inferred from the use of a deadly weapon,

> pulling a knife out, . . . swinging the knife at another individual and stabbing the individual in the chest as a reaction to getting hit [on] the head, . . . appearing confused after stabbing someone in the chest, and . . . fleeing the scene immediately after stabbing someone would not support a finding of recklessness to a sufficient level that would allow a rational jury to have concluded that if [Appellant] was guilty, she was guilty of only manslaughter.

*Id.* at 127. *Cavazos* is factually distinguishable in that it dealt with a defendant who shot the victim twice, and Cavazos admitted that he shot the victim, but he said that he "didn't mean to shoot anyone." Appellant stabbed Fatima; she did not shoot her, and she repeatedly lied, claiming that she did not stab anyone and that she was the victim because

and committed an act clearly dangerous to human life";

*Ritcherson*, 476 S.W.3d at 125–27.

someone stabbed her. Further, our statement in *Cavazos* that the intent to kill can be inferred from the firing of a gun at a person multiple times improperly focuses on whether the evidence was sufficient to prove an element of the greater crime. *Cavazos*, 382 S.W.3d at 387 (Keller, P.J., concurring).

### c. Discussion

Appellant argues that Ryan's testimony could be reasonably interpreted to show that she stabbed Fatima in the chest as a reflexive reaction to being struck on the head by a shoe. But even if Ryan had meant that Appellant was unable to physically control her action of stabbing Fatima in the chest in response to being attacked, as Appellant argues, the jury could not have reasonably inferred that Appellant stabbed Fatima only recklessly. A person can commit a criminal offense only "if he voluntarily engages in conduct, including an act, an omission, or possession." TEX. PENAL CODE § 6.01(a). Therefore, if the jury took Ryan's use of the word "reflex" literally, its only option was to acquit Appellant because a jury cannot infer intent from a reflexive reaction,[12] and a reflexive reaction does not constitute a voluntary act as contemplated by Section 6.01(a).

Next, Appellant complains that the court of appeals erred because it acted as a thirteenth juror when it said that Ryan's "reflex" testimony was "more appropriately . . . read as stating that Appellant swung her arm as a reaction to having

---

[12]*See Brown v. State*, 955 S.W.2d 276, 280 (Tex. Crim. App. 1997) (quoting *Adanandus v. State*, 866 S.W.2d 210, 230 (Tex. Crim. App. 1993)) ("[T]he issue of the voluntariness of one's conduct, or bodily movements, is separate from the issue of one's mental state.").

been hit on the head rather than an assertion that Appellant was somehow not in control of her behavior." *Ritcherson*, 476 S.W.3d at 127. The lower court reached this conclusion in part because, although Ryan agreed that Appellant's stabbing of Fatima was a reflex, in his next answer he characterized the stabbing as a reaction. We find no fault with the court of appeals's analysis. *See Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000). When determining whether there is evidence that would allow a jury to find that, if a defendant is guilty, he is guilty of only the lesser-included offense, appellate courts examine the entire record and cannot "pluck[] certain evidence from the record and examin[e] it in a vacuum." *Id.* (citing *Ramos v. State*, 865 S.W.2d 463, 465 (Tex. Crim. App. 1993)).

For example, in *Enriquez*, Enriquez was charged with delivery of between 50 and 2,000 pounds of marijuana. *Id.* at 278. The marijuana was packed into 205 separate bundles. *Id.* at 278. The State's chemist testified, in part, that she tested a bundle that weighed 7.44 pounds. *Id.* According to the court of appeals, that part of the chemist's testimony allowed for the possibility that she did not test all the bundles to confirm that it was all marijuana. *Id.* Therefore, the court of appeals reasoned, a jury could have rationally concluded that Enriquez might have possessed only between 5 and 50 pounds of marijuana. *Id.* We reversed, explaining that a fair reading of the chemist's testimony showed that delivery of between 5 and 50 pounds of marijuana was not a rational alternative to the charged offense and that the court of appeals's conclusion that he was

entitled to the lesser-offense instruction "require[d] plucking a single statement from the chemist's cross-examination testimony . . . and examining it in a vacuum." *Id.* at 279–80.

Examining Ryan's "reflex" answers in a vacuum, it might be possible for a jury to infer that Appellant did not intentionally or knowingly stab Fatima in the chest—despite the problems outlined above—but that analytical approach runs afoul of our holding in *Enriquez* that the entirety of a witness's testimony must be considered when applying the second step of the lesser-included offense test. Here, a fair reading of Ryan's testimony is that Appellant reacted to Fatima lunging at her by stabbing Fatima in the chest. It stretches credulity to argue that a person's involuntary, instinctual response to being hit on the head is to stab that other person in the chest. We also note that Appellant has not cited a decision from any jurisdiction or any other evidence that would support such an assertion.

Finally, Appellant argues that the evidence was susceptible to different interpretations because Appellant stabbed Fatima only once, with a knife of indeterminate size, under circumstances which would support a reasonable conclusion that she acted without deliberation, and in response to provocation. We disagree. Even if Appellant stabbed Fatima to protect herself and in response to provocation, that is not evidence that she did not intentionally or knowingly stab Fatima with the intent to kill her or to cause her serious bodily injury. People acting in self-defense often have the intent to kill or to cause serious bodily injury. Similarly, the fact that Appellant stabbed Fatima only once

does not lend itself to a reasonable inference that Appellant acted only recklessly. Some people intend to kill by stabbing another person a single time, while other people might stab a person only once while recklessly swinging a knife, and they have no intent to kill the person. In other words, those facts by themselves do not inform the question of Appellant's intent at the time that she stabbed Fatima. There was some evidence that Appellant waved the knife in the air before stabbing Fatima, but the issue is not Appellant's intent when she waved the knife in the air; it is Appellant's intent when she stabbed Fatima in the chest, piercing her pulmonary artery. We also are not persuaded by Appellant's arguments that a jury could have reasonably inferred that she acted only recklessly because some witnesses did not agree on the size of the knife blade. There is no evidence that would support a reasonable inference that Appellant believed that the knife was not capable of causing death or serious bodily injury. We conclude that there is no reasonable interpretation of the evidence that would allow a jury to rationally find that Appellant acted only recklessly when she stabbed Fatima in the chest.

## CONCLUSION

We agree with the court of appeals that Appellant was not entitled to a lesser-offense instruction on manslaughter, although we reach that conclusion based on different reasoning. Consequently, we affirm the judgment of the court of appeals.

Delivered: December 12, 2018

Publish