**Affirmed as Modified and Opinion Filed August 7, 2024**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-22-01271-CR
_____

**ASHTON DESHAUN NEROES, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F20-41836-V**

## MEMORANDUM OPINION

Before Justices Nowell, Miskel, and Kennedy
Opinion by Justice Miskel

Ashton Neroes appeals the trial court's judgment convicting him of murder.

The jury found him guilty and assessed his punishment at fifty years of

imprisonment and a $10,000 fine. Neroes raises three issues on appeal: (1) the

evidence was insufficient to prove he acted with the requisite culpable mental state;

(2) the trial court erred by refusing his request for a lesser-included offense; and

(3) the trial court erred when it overruled his objection to the admission of two

Facebook posts that he allegedly authored. The State raises one cross-point

requesting that the judgment be modified to include a deadly-weapon finding.

We conclude the evidence is sufficient to support Neroes's conviction. We further conclude that the trial court did not err when it denied Neroes's request for the inclusion of a lesser-included offense in the jury charge and that, even if it erred, any error was harmless. Also, even assuming, without deciding, that the trial court erred in admitting the Facebook posts, we conclude that any error was harmless. In addition, the jury made an affirmative finding of a deadly weapon. We modify the judgment to include a deadly-weapon finding and affirm the trial court's judgment as modified.

## I.    Background

Neroes and his wife Markeita McCleary were married for five years. After four years, they and their three children moved in with McCleary's parents for a year to save money and then moved into an apartment complex in Mesquite, Texas. At some point during their marriage, McCleary and Neroes began experiencing marital issues.

On Sunday, October 18, 2020, McCleary, and her 8-year-old son A.N. arrived at their apartment and were greeted by Neroes. Shortly after, McCleary and Neroes began arguing in their bedroom. At this time A.N. was playing in a nearby room. He heard his mother scream his nickname and the sound of multiple gunshots. He ran out of the apartment for help and told his neighbors who were in the parking lot, "I think my dad shot my mom." The neighbors immediately called 911. They described A.N. as "hysterical," in "shock," "scared," and "afraid." Shortly after,

Neroes walked out from the breezeway of the apartment complex and yelled for his son to get into the car. A.N. complied. One neighbor testified that Neroes appeared "calm… as if nothing happened." The other neighbor testified that Neroes appeared mad but clarified that he was not threatening. Neroes dropped his son off at McCleary's parents' doorstep and, according to A.N., told A.N. he loved him and handed him his Bible.

McCleary's sister, Jessica Brown, was at the house and received a Ring alert on her phone. She saw A.N. at the front door "wiping his eyes" and appearing "distraught." She testified that he stated he was sleepy and went to lie down in the bedroom.

McCleary's father, Mark McCleary, also received a notification on his Ring doorbell camera that someone was at his front door. The video showed Neroes leaving his son standing shirtless and shoeless on his front porch. Mr. McCleary immediately headed home and stated that, while driving, he received a Facebook notification for a post from Neroes's Facebook page. The Facebook post read: "Never got closure, but I'll walk away a winner regardless."

After Neroes left his son on Mr. McCleary's front porch, he headed to the Lew Sterrett Jail to turn himself in because he felt like he had done something wrong. Deputy Jeffrey Thames asked Neroes why he was turning himself in, to which Neroes responded, "I killed my wife," "I murdered my wife." Neroes appeared lucid and answered all of Deputy Thames' questions directly. After the Mesquite Police

Department confirmed Neroes's information, Deputy Thames detained Neroes. The Mesquite Police Department found McCleary pulseless with sixteen wounds in her upper body.

Mesquite Police Department Investigator Frank Tinney obtained a search warrant for Neroes's vehicle and apartment, and he found eight shell castings but no weapon. Mr. McCleary cleared out the apartment after this investigation and discovered divorce documents, a receipt for a Smith & Wesson handgun, and a ninth spent shell casing. At trial he also testified that three days prior to the murder, Neroes had posted "Rebuilding from scratch" on Facebook.

A grand jury indicted Neroes, and he pleaded not guilty. Neroes was tried before a jury and testified on his own behalf. He testified that he encouraged the divorce because McCleary was unhappy in the marriage. Neroes stated that in late August 2020, he had an argument with McCleary that resulted in her hiding Neroes's Glock handgun from him. Neroes said that McCleary was scared of him having a firearm because he had previously pulled the Glock out during an argument, and then they "tussled" over the gun while his daughter was in the house. McCleary hid the Glock from him. In late August, they had another argument that resulted in Neroes jumping out of McCleary's car and disappearing for a few days. The day he returned home, he purchased a new firearm. An Academy store employee testified that he sold a Smith & Wesson .40 caliber gun to Neroes on August 25, 2020.

At trial, Neroes denied knowing why he pulled out the gun the day of McCleary's murder. He testified that he and McCleary were in the bedroom and that she turned out the light, which made the room dark due to their blackout curtains. He asked her if they could talk, and the rest happened "fast" and was a "nightmare." He stated that he grabbed his bag and removed the divorce papers. McCleary responded by lunging to the front of the wall like she was going to run away. He stated that he grabbed his gun and aimed it at the wall "not even looking at her," and he shot the gun multiple times. Neroes testified that he did not feel threatened by McCleary and that she was unarmed. He also testified that it seemed like a dream to him and that he didn't feel like he murdered his wife. He admitted to realizing he needed to dispose of the firearm. Neroes tossed the murder weapon but could not recall the location.

Following the trial, the jury was charged on the offense of murder and the lesser-included offense of manslaughter. The jury found Neroes guilty of murder and assessed his punishment at fifty years in prison and a $10,000 fine. This appeal followed.

## II.    Sufficient Evidence to Prove Intentional and Knowing Conduct

In his first issue, Neroes argues that the evidence was insufficient to support his murder conviction because it fails to prove that he acted with the requisite culpable mental state. We conclude that the evidence was sufficient for a rational juror to find that Neroes acted intentionally or knowingly.

–5–

## A.    Standard of Review

Under the due process clause, a criminal conviction must be based on legally sufficient evidence. *Harrell v. State*, 620 S.W.3d 910, 913 (Tex. Crim. App. 2021). When reviewing the legal sufficiency of the evidence to support a criminal conviction, an appellate court considers all the evidence in the light most favorable to the verdict and determines whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979)). Further, an appellate court is required to defer to the jury's credibility and weight determinations because the jury is the sole judge of witnesses' credibility and the weight to be given testimony. *Id.*

When the evidence presented at trial supports contradicting inferences, reviewing courts must presume the jury resolved any such conflicts in favor of the verdict, even if not explicitly stated in the record. *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). Evidence may be legally insufficient when the record contains either no evidence of an essential element, merely a modicum of evidence of one element, or if it conclusively establishes a reasonable doubt. *Id.*

Circumstantial evidence of an accused's mental state is not treated any differently than circumstantial evidence of other elements, and circumstantial evidence is reviewed under the same standard as direct evidence. *Laster v. State*,

275 S.W.3d 512, 521 (Tex. Crim. App. 2009). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt. *Hammack v. State*, 622 S.W.3d 910, 914–15 (Tex. Crim. App. 2018). When determining the sufficiency of the evidence, a reviewing court looks at events occurring before, during and after the commission of the offense. *Id.* at 914.

**B.      Applicable Law**

A person commits the offense of murder if the person (1) intentionally or knowingly causes the death of an individual, or (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. TEX. PENAL CODE ANN. § 19.02(b)(1), (2).

A person acts "intentionally," or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. *Id.* § 6.03(a). A person acts "knowingly," or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result. *Id.* § 6.03(b). A person acts "recklessly," or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. *Id.* § 6.03(c).

## C. Evidence Supports Inference of Intent Beyond a Reasonable Doubt

It is undisputed that Neroes shot and killed his wife. Neroes disputes, however, the degree of his culpability based on his mental state at the time of the event. He asserts that the evidence shows that he did not shoot his wife with the intent to cause her death or serious bodily injury and that he did not shoot his wife knowing that her death would be reasonably certain. Instead, Neroes argues that he acted recklessly with respect to the circumstances surrounding his conduct by disregarding the risk that firing his gun in the dark room could kill his wife.

By asserting that he acted recklessly, Neroes argues that he committed manslaughter instead of murder. *See id.* § 19.04(a) (providing that a person commits manslaughter if the person "recklessly causes the death of an individual"). The jury charge included an instruction on manslaughter, but the jury found Neroes guilty of murder.

A jury may infer intent or knowledge from any facts which tend to prove its existence, including the acts, words, and conduct of the accused, and the method of committing the crime and from the nature of wounds inflicted on the victim. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002); *see also Nisbitt v. State*, 552 S.W.3d 244, 267 (Tex. Crim. App. 2018) ("By its nature, a culpable mental state must generally be inferred from the circumstances.")

The record contains ample direct and circumstantial evidence from which a jury could reasonably have inferred the Neroes intentionally and knowingly caused

McCleary's death. The jury heard evidence of the couple's marital problems and the divorce petition signed by both Neroes and McCleary. He claimed that he had initiated the petition but denied knowing that McCleary had already told her friends beforehand that they were getting divorced. Evidence suggested that Neroes questioned the paternity of his youngest child.

The jury heard evidence of prior arguments, including that he pulled out a loaded Glock during an argument and that he and McCleary tussled over it. Neroes testified that she was scared to have a gun in the house after this incident and hid it from him, but he later purchased another gun upon returning home after disappearing for a few days. A rational jury could have inferred that he intended to kill his wife based on these incidents.

A reasonable jury also could have questioned the credibility of his testimony regarding the circumstances of the shooting. Neroes testified that he and McCleary did not have an argument that afternoon, but his son testified that he heard his parents arguing right before he heard gunshots. Neroes denied knowing or remembering why McCleary ran from him, but he testified that as she attempted to run away from him, he reached for his handgun and aimed it at the wall. He stated that he did not intend to kill her. McCleary was shot eight times, but the wall was never hit. Her sixteen (entrance and exit) gunshot wounds were clustered in the upper torso, abdomen, and upper arms. A jury could have inferred that Neroes intended to kill McCleary based on the extent of these wounds and the location of the injuries on her

body.  *See Nisbett*, 552 S.W.3d at 267 (stating that a jury may infer a culpable mental state from the extemt of the victim's injuries).

In addition, specific intent to kill may be inferred from the use of a deadly weapon.  *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2011).  It is "a common-sense inference" that "a person intends the natural consequences of his acts, and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill."  *Ex Parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (internal citations omitted).

He then fled the scene of the crime and threw away the gun.  Finally, Neroes even admitted "I murdered my wife" at the police station when he went to turn himself in.

After reviewing the evidence, we conclude that a rational jury could have found that Neroes intentionally or knowingly caused the death of McCleary.  Viewed in the light most favorable to the verdict, we conclude that the evidence is sufficient to support the jury's verdict of murder beyond a reasonable doubt.  We overrule Neroes's first issue.

## III. No Error in Denying Request for Jury Charge on Criminally Negligent Homicide, and any Error was Harmless

Neroes argues that the trial court erred by refusing his request for a jury instruction on criminally negligent homicide because there was some evidence at trial that he caused McCleary's death by criminal negligence.  *See* PENAL § 19.05(a).

## A.     Standard of Review

Texas law requires the trial judge to deliver to the jury a written charge "distinctly setting forth the law applicable to the case." TEX. CODE CRIM. PROC. ANN. Art. 36.14. A review of alleged jury-charge error involves two steps: First, the reviewing court must determine whether the charge is erroneous. *Alcoser v. State*, 663 S.W.3d 160, 165 (Tex. Crim. App. 2022). If it is, then the court must decide whether the appellant was harmed by the erroneous charge. *Id.*

There are two standards of review for jury-charge-error claims. *Id.* (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). If a defendant timely objects to alleged jury-charge error, the record need only show "some harm" to obtain relief. *Id.* If there was not a timely objection, the record must show "egregious harm." *Id*. Harm is assessed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the argument of counsel, and any other relevant information revealed by the record of the trial as a whole. *Id.* (citing *Almanza*, 686 S.W.2d at 171).

## B.     Applicable Law

Appellate courts use a two-step analysis to determine if a defendant is entitled to a lesser-offense instruction. *Ritcherson v. State*, 568 S.W.3d 667, 670 (Tex. Crim. App. 2018). First, courts compare the statutory elements of the alleged lesser offense and the statutory elements and any descriptive averments in the indictment. *Id.* at 670–71. Second, there must be evidence from which a rational jury could find the

–11–

defendant guilty of only the lesser offense. *Id.* at 671. This second requirement is met if there is (1) evidence that directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) evidence that is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense. *Id.* The evidence raising the lesser offense must be affirmatively in the record. *Id.* In other words, a defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be "directly germane to the lesser-included offense ...." *Id.* (quoting *Skinner v. State*, 956 S.W.2d 532, 543 (Tex. Crim. App. 1997)).

Reviewing courts consider all the evidence admitted at trial, not just the evidence presented by the defendant. *Id.* If there is more than a scintilla of evidence raising the lesser offense and negating or rebutting an element of the greater offense, the defendant is entitled to a lesser-charge instruction. *Id.* It does not matter whether the evidence is controverted or even credible. *Id.* If the jury is charged on alternate theories, the second prong of the lesser-offense test is met "only if there is evidence which, if believed, refutes or negates every theory which elevates the offense from the lesser to the greater." *Id.* (quoting *Arevalo v. State*, 970 S.W.2d 547, 548 (Tex. Crim. App. 1998)).

Lesser-included offenses are defined in the Texas Code of Criminal Procedure, which states in relevant part that an offense is a lesser-included offense

if "it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission." CRIM. PROC. art. 37.09(3).

Culpable mental states are classified according to relative degrees from highest to lowest as follows: (1) intentional; (2) knowing; (3) reckless; and (4) criminal negligence. PENAL § 6.02(d). Proof of a higher degree of culpability than that charged constitutes proof of the culpability charged. *Id.* § 6.02(e).

A person commits criminally negligent homicide if the person "causes the death of an individual by criminal negligence." *Id.* § 19.05(a). The definition of criminal negligence states:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

*Id.* § 6.03(d). The circumstances are viewed from the standpoint of the defendant at the time the allegedly negligent act occurred. *Queeman v. State*, 520 S.W.3d 616, 623 (Tex. Crim. App. 2017).

## C. No Evidence of Failure to Perceive Risk Created by Conduct

Neroes argues that the trial court erred by refusing his request to give an instruction on criminally negligent homicide because his testimony sufficiently raised the issue of whether he perceived the risk his conduct posed to McCleary. He contends that this error caused some harm to him because the penalty range for

criminally negligent homicide is 180 days to two years in prison, which is lower than the penalty range for murder.[1] *See* PENAL §§ 12.35(a), 19.05(b).

Neroes was charged with and convicted of murder. The trial court instructed the jury on murder and also on the lesser-included offense of manslaughter but did not include an instruction on criminally negligent homicide. Criminally negligent homicide is a lesser-included offense of murder because the only difference is that the lesser culpable mental state of criminal negligence suffices to establish its commission. PENAL §§ 19.04, 19.05. Therefore, the first part of the lesser-offense test is satisfied.

To satisfy the second part of the lesser-offense test, there must be evidence from which a rational jury could find Neroes guilty of only the lesser offense of criminally negligent homicide. *See Ritcherson*, 568 S.W.3d at 671. The record must contain some evidence that would permit a rational jury to find that Neroes possessed the culpable mental state of criminal negligence rather than a reckless or intentional or knowing mental state. In other words, the record must contain some evidence that Neroes failed to perceive the risk that firing a gun in the bedroom aimed towards the wall but in the direction of his wife would result in her death. Neroes argues that his testimony was sufficient to raise this issue.

---

[1] A fine of up to $10,000 may also be imposed for any felony other than a capital felony. *See* PENAL §§ 12.31–35.

At trial, Neroes testified that his recollection of the incident was "not like a blur" but "patchy."  McCleary and A.N. returned home, and Neroes remembered hugging his son but did not exchange words with McCleary.  He stated, "I was walking down the sidewalk and I had, like, a sudden pause.  I paused.  It was like a– like a gaze and pause."  Neroes went back into that house and was sitting on the bed in the bedroom when McCleary came into the room and turned off the bathroom light, leaving the room dark with "a little bit of sunlight but not much."  Neroes said he wanted to talk to her and testified as follows:

A. . . . . After that, everything just happened just so fast. It was really, really fast, like -- like a --like a -- like a nightmare. Like, it --

Q.  Do you remember what she wanted to talk about?

A.  There were no words exchanged.

Q.  You said it was like a nightmare.  Can you tell us what that nightmare was?

A.  So I grabbed -- I grabbed my bag, removed the divorce papers.  She lunged to the front of the bed and the front of the wall like she was to take off running.  And I'm looking, and I grabbed the gun.  At this time I'm aiming at the wall, not even looking at her.  She screams, "Puda." I'm watching him run out the door of the house.  The reason why I said it seems like a dream to me is because aiming at somebody without looking at them, watching the kid run out the door and looking at the - - as far as looking at the evidence, it doesn't seem to appear to be real to me.  But I do remember everything to be as clear, but it doesn't feel like a -- it doesn't feel to be real to me.

. . . .

Q.  Did you mean or intend to kill Markeita?

A.  No, sir. No intent.

–15–

Q.   Do you know that if somebody pulls a trigger, that could kill somebody?

A.   I do know that if I pull the trigger, you --yes, but I didn't mean to hurt or murder anybody.

. . . .

Q.   You know that killing a person is a bad thing, don't you?

A.   I understand that, yes, but I didn't – I don't feel like I murdered my wife.

Q.   Why not?

A.   I also believe people can do magic things, as far as putting thoughts in your mind or making you believe something that didn't happen, and you can remember those things.

. . . .

A.   I don't remember shooting. Like, I don't remember actually --

Q.   Uh-huh.

A.   -- aiming at her. As far as, like, me sitting on the left side of the backside of the bed, her sitting -- she actually turned the light off and then sit on the right side of the front of the bed.  I go -- this is what I remember. I don't know if this is actually happening. People daydream, dreaming -- things happen -- things when -- so I remember just going for the right -- for the pistol distance and aiming at the wall. As soon as I aim at the wall, I'm looking at [A.N.] run out the door. [A.N.] is running in that direction. Markeita is running towards wherever she is. I'm not really actually seeing.  I just aim at the wall, boom, boom, boom, boom, boom, boom, boom, boom.

This testimony shows that Neroes was intending to discuss their divorce papers, that he grabbed the gun while McCleary was lunging away from him to the front of the wall, that he aimed it at the wall without looking in a dark room and fired the gun nine times.  His trial testimony indicated that he was aware that if "somebody

pulls a trigger that could kill somebody."  This awareness was also evident in his testimony about his previous tussle with McCleary over the loaded Glock, in which he said he had been concerned about her finger on the trigger and that the loaded handgun might go off and hurt someone.  Neroes further testified that he had previously owned handguns for protection.  This evidence indicates that he perceived the risk that his conduct created and is not entitled to a charge of criminally negligent homicide.  *See Thomas v. State*, 699 S.W.2d 845, 850 (Tex. Crim. App. 1985), *abrogated on other grounds by Nejar v. State*, 618 S.W.3d 366, 371–72 (Tex. Crim. App. 2021) ("Evidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another indicates a person who is aware of a risk created by that conduct and disregards the risk."); *Trujillo v. State*, 227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist. 2006], pet ref'd).

Neroes's testimony demonstrates that, even if he could not remember or explain why he shot the gun, he did not fail to perceive the risk it created.  We conclude that the second step of the lesser-charge test has not been satisfied, and Neroes was not entitled to a jury charge on criminally negligent homicide.

**D.    Any Error was Harmless**

Further, even if the trial court erred by refusing to include a jury instruction on criminally negligent homicide, we conclude that any error was harmless.  The offense of criminally negligent homicide is a lesser-included offense of

–17–

manslaughter. *Stadt v. State*, 182 S.W.3d 360, 364 (Tex. Crim. App. 2005); PENAL §§ 19.04, 19.05. While the existence of an instruction regarding the intervening lesser offense of manslaughter interposed between murder and criminally negligent homicide "does not automatically foreclose harm—because in some circumstances that intervening lesser offense may be the least plausible theory under the evidence—a court can conclude that the intervening offense instruction renders the error harmless if the jury's rejection of that offense indicates that the jury legitimately believed that the defendant was guilty of the greater, charged offense." *Masterson v. State*, 155 S.W.3d 167, 171–72 (Tex. Crim. App. 2005).

Based on the facts in this case, the jury's choice to convict Neroes of murder instead of manslaughter indicates that the jury believed Neroes intentionally or knowingly killed McCleary and rejected his contention that his conduct was unintentional and may have been affected by "magic" or that he was in a dreamlike state that caused him to disregard the risk that shooting towards the wall multiple times in the dark bedroom might cause her death. *See Taylor v. State*, No. 05-17-00658-CR, 2018 WL 3640467, at *11 (Tex. App.—Dallas Aug. 1, 2018, no pet.) (mem. op., not designated for publication) (concluding that the jury's choice to convict the defendant of murder rather than manslaughter showed that the jury rejected her testimony that the gun "just went off"). Even if the jury charge had included criminally negligent homicide, the jury's conviction of Neroes for murder instead of opting for the intervening offense of manslaughter indicated that the jury

–18–

believed he acted intentionally and knowingly on the facts in this case. We conclude that even if the trial court erred when it refused to charge the criminal negligence, that error was harmless. Accordingly, we overrule Neroes's second issue.

## IV. No Harm From Admitting Facebook Posts

Neroes argues that the trial court erred by overruling his authentication objection and admitting two Facebook posts that he claims were insufficiently linked to him as the author. One Facebook post was dated three days prior to the murder and stated "Rebuilding from scratch." The second Facebook post was posted on the day of the murder and stated "Never got closure, but I'll walk away a winner regardless." Neroes contends that the admission of these Facebook posts was harmful error because the jury might have inferred from them that his mental state was intentional and knowing rather than reckless.

### A. Standard of Review

An appellate court reviews a trial court's ruling on the preliminary question of authenticity of evidence under an abuse of discretion standard. *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). If the trial court's ruling that a jury could reasonably find proffered evidence authentic is at least "within the zone of reasonable disagreement," a reviewing court should not interfere. *Id.* The ultimate question whether an item of evidence is what its proponent claims is a question for the jury. *Id*.

**B.    Applicable Law**

The admissibility of evidence at trial is a preliminary question to be decided by the court. TEX. R. EVID. 104(a). Evidence may be authenticated based on "testimony of a witness with knowledge" that "an item is what it is claimed to be" or by its "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." TEX. R. EVID. 901(b)(1), (4).

In performing this gate-keeping function, the trial court itself need not be persuaded that the proffered evidence is authentic. *Tienda*, 358 S.W.3d at 638. The preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic. *Id.* Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence. *Id.*

An electronic communication must be sufficiently linked to its purported author to be submitted to the jury for its ultimate determination of authenticity. *See id.* at 639. A combination of distinctive characteristics can be sufficient to support a finding that an internet post was made by a party. *See id.* at 645.

The erroneous admission of evidence is non-constitutional error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018). Rule 44.2(b) provides that we

must disregard any non-constitutional error that does not affect substantial rights. TEX. R. APP. P. 44.2(b). A defendant's substantial rights are affected when the error has a substantial and injurious effect or influence in determining the jury's verdict. *Cook v. State*, 665 S.W.3d 595, 599 (Tex. Crim. App. 2023). A court will not overturn a conviction if, after examining the record as a whole, it has fair assurance that the error did not influence the jury or did so only slightly. *Id.* In making this determination, the following nonexclusive factors are considered: the character of the alleged error and how it might be considered in connection with other evidence, the nature of the evidence supporting the verdict, the existence and degree of additional evidence indicating guilt, whether the State emphasized the complained-of error, the trial court's instructions, the theory of the case, and relevant voir dire. *Id.*

## C. Even Assuming Error, Any Error Was Harmless

Neroes contends that the State failed to produce supporting evidence to address the inherent uncertainty of authorship presented by the Facebook posts purportedly authored by Neroes. He argues that the error was harmful because Neroes's mental state was the contested issue at trial, and the Facebook posts allowed the jury to draw the reasonable inference that Neroes's mental state was either intentional or knowing rather than reckless.

To lay a predicate for the admission of this evidence, Mr. McCleary testified that he was Facebook friends with Neroes, that the Facebook posts looked like his

Facebook page, and that the photos on the page were photos of Neroes. Moreover, Neroes testified that "maybe yes" he created the Facebook post on October 18, 2020, that read: "Never got closure, but I'll walk away a winner regardless." Neroes's own testimony supports a finding by a rational jury that he created that post.

Even if we assume, without deciding, that the trial court abused its discretion in admitting the "rebuilding from scratch" Facebook post as evidence based on this predicate, we conclude that any error was harmless because it did not affect Neroes's substantial rights due to significant additional evidence that Neroes intentionally and knowingly shot McCleary, including his own testimony.

We have reviewed in detail the evidence of Neroes's culpable mental state earlier in this opinion. Neroes testified that he grabbed the gun and aimed at the wall, firing nine times towards McCleary. No bullets hit the wall, and McCleary had sixteen entry and exit gunshot wounds in her upper torso and arm area. Neroes testified that he had purchased guns for protection and knew that if he pulled the trigger he could hurt somebody. He also testified that he had pulled out a gun in McCleary's presence on a previous occasion, causing them to tussle over it, and that he had been concerned about the possibility of the gun going off.

Although Neroes's mental state was the primary issue in the case and the State discussed the Facebook posts in its closing argument, the record contains significant additional evidence from which we conclude that any erroneous admission of these

exhibits did not have a substantial and injurious effect or influence in determining the jury's verdict. Neroes's third issue is overruled.

## V. Modification of Judgment to Add Deadly-Weapon Finding

The State requests that we modify the judgment to include a deadly-weapon finding. This Court has the power to modify a judgment to speak the truth when it has the necessary information to do so. *See* TEX. R. APP. P. 43.2(b); *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992) (adopting the reasoning in *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd) (en banc)). Courts look to the charging instrument, the jury charge, and the jury verdict to evaluate the propriety of an entry of a deadly-weapon finding in the judgment. *Duran v. State*, 492 S.W.3d 741, 746 (Tex. Crim. App. 2016). One way a jury may make this affirmative finding is by finding the defendant "guilty as charged in the indictment" when the indictment specifically alleged a deadly weapon was used. *Id.*

The indictment charged Neroes with murder "by shooting deceased with a firearm, a deadly weapon." The jury charge defined "deadly weapon" and instructed the jury regarding the charged offense of shooting the deceased with a deadly weapon. The jury found Neroes guilty "as charged in the indictment." The record thus contains sufficient evidence to support the conclusion that the jury made a deadly weapon finding. *See id.* Accordingly, we modify the trial court's judgment to correct the error under "Findings on Deadly Weapon" by replacing "N/A" with "Firearm."

–23–

## VI. Conclusion

We conclude the evidence is sufficient to support Neroes's conviction. We further conclude that the trial court did not err when it denied Neroes's request for a jury charge on a lesser-included offense and that, even if it erred, any error was harmless. Also, even assuming, without deciding, that the trial court erred in admitting the Facebook posts, we conclude that any error was harmless. In addition, the jury made an affirmative finding of a deadly weapon.

We modify the trial court's judgment as follows: After "Findings on Deadly Weapon," "N/A" is replaced by "Firearm." We affirm the judgment as modified.

The trial court is directed to prepare a corrected judgment that reflects the modifications made in this Court's opinion and judgment in this case. *See Shumate v State*, 649 S.W.3d 240, 244–45 (Tex. App.—Dallas 2021, no pet.).

/Emily A. Miskel/
EMILY A. MISKEL
JUSTICE

Do Not Publish
TEX. R. APP. P. 47
221271F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ASHTON DESHAUN NEROES,
Appellant

No. 05-22-01271-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F20-41836-V.
Opinion delivered by Justice Miskel.
Justices Nowell and Kennedy
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

After "Findings on Deadly Weapon, " "N/A" is replaced by "Firearm."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 7th day of August 2024.